Leslie Ann JEFFRIES, Plaintiff,

v.

STATE OF KANSAS, DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES, and The Reverend Dr. Ed Outlaw, Jr., Defendants.

No. 95–4047–SAC.

United States District Court, D. Kansas.

Oct. 25, 1996.

Alan V. Johnson, R. Scott Seifert, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, for Leslie Ann Jeffries.

Jane Kelly Coates, Social & Rehabilitation Services, Office of the General Counsel, Topeka, KS, Betsy B. Patrick, Kansas Department of SRS, Osawatomie, KS, Gregory A. Lee, Gehrt & Roberts, Chartered, Topeka, KS, for State of Kansas, Kansas Department of Social and Rehabilitation Services.

Betsy B. Patrick, Kansas Department of SRS, Osawatomie, KS, Gregory A. Lee, Gehrt & Roberts, Chartered, Topeka, KS, for Ed Outlaw.

## MEMORANDUM AND ORDER

CROW, District Judge.

This sexual harassment case comes before the court on the defendants' motion for summary judgment. (Dk. 42). The plaintiff, Leslie Ann Jeffries ("Jeffries"), was hired by the defendant State of Kansas, Department of Social and Rehabilitation Services ("SRS"), as a resident chaplain and student of the clinical pastoral education program ("CPE program") at Osawatomie State Hospital ("Hospital"). The plaintiff claims she was subjected to a hostile work environment marked by a single incident where a fellow student in the CPE program hugged and kissed her. She alleges the incident "occurred because the defendants failed to take reasonable remedial action to prevent it." (Dk. 53 at 3). The plaintiff further alleges that her supervisor and instructor retaliated against her when she took her complaint of sexual harassment to the superintendent of the Hospital. The plaintiff's final claim is "that her resignation constituted a constructive discharge caused by" her supervisor's retaliatory acts. (Dk. 53 at 4). The defendants seeks summary judgment on all claims.

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v.*

*Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.,* 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' "[1] *Thomas v. International Business Machines,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir.1995).

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine

witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

Summary judgments are "used sparingly in employment discrimination cases." *Hardin v. Hussmann Corp.,* 45 F.3d 262, 264 (8th Cir.1995). This is because discrimination claims often turn on the employer's intent, *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 370–71 (7th Cir.1992), and courts ordinarily consider summary judgment inappropriate to settle an issue like intent, *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 530 (10th Cir.1994). Even so, summary judgment is not "per se improper," *Washington v. Lake County, Ill.,* 969 F.2d 250, 253 (7th Cir.1993), and may be useful in weeding out claims and cases obviously lacking merit, *Summers v. State Farm Mut. Auto. Ins. Co.,* 864 F.2d 700, 709 (10th Cir.1988), *overruled on other grounds, McKennon v. Nashville Banner Pub. Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995).

Drawing all reasonable inferences in the plaintiff's favor, the court finds the following facts for purposes of this summary judgment ruling.

1. The State of Kansas through the SRS provides and administers inpatient psychiatric treatment. Osawatomie State Hospital ("Hospital") is one of the state's inpatient psychiatric treatment facilities.

2. During the relevant time periods, the Hospital has sponsored a clinical pastoral education ("CPE") program which offers specialized pastoral training to seminary students and others and which provides spiritual care to those patients requesting it.

3. The plaintiff Jeffries was a "resident" student in the Hospital's CPE program. Because of her services to the Hospital's wards,

---

**1.** "[T]he nonmoving party need not produce evidence 'in a *form* that would be admissible at trial,' ..., but the content or substance of the evidence must be admissible." *Thomas v. International Business Machines,* 48 F.3d 478, 485 (10th Cir.1995) (citations omitted). The plaintiff

cites her letter written to the superintendent (Dk. 43, Ex. V), as evidence of the events described therein. (E.g., Dk. 49, ¶¶ 29, 31, and 32). To use of the letter for that purpose amounts to inadmissible hearsay.

she was considered a state employee and received a salary. The plaintiff's participation in the CPE program and her employment were governed by a one-year contract running from August 30, 1991, through August 29, 1992, with the Department of Pastoral Care and Education at the Hospital. The contract provided that it could "be extended by mutual consent of both parties" and be terminated upon written notice to the other party thirty days before the proposed termination. Resident students generally stayed a second year if both parties and the hospital were satisfied with the arrangement and performance during the first year.

4. When Jeffries started the CPE program in September of 1991, she and two men—Glenn Hoyt and Jerry Muncey—were the resident students. The Director of the CPE program for all relevant periods was the Reverend Dr. Ed Outlaw. He not only supervised and assigned the student's clinical duties at the hospital, but he also provided their pastoral education during the same period.

5. Dr. Outlaw assigned Jeffries to the Hospital's substance abuse program. Immediately prior to Jeffries, Hoyt had served as the chaplain to the substance abuse program for sixteen months. Dr. Outlaw directed Hoyt to work with Jeffries for the month of September and to orient her on the policies, procedures and schedules of the program as well as the nature of the pastoral care involved.

6. On October 4, 1991, Hoyt entered the open door to Jeffries' office, which she shared with a nurse, to pick up his briefcase and coat. As he entered, Hoyt started to close the door when Jeffries told him to leave the door open. Hoyt responded that he wanted to hug Jeffries and he did not want others to see. According to Jeffries, Hoyt swiftly approached and hugged her, placed his legs so that she couldn't retreat, and kissed her on the neck and mouth. In her deposition, Jeffries described the event in these terms: "It was just invaded my space very rapidly. I felt penis against my body. There was a kiss on my neck and on my mouth and it startled me, stunned me, scattered me, scared me." (Jeffries Dep. at 181).

7. Hoyt's hug and kiss lasted about three seconds or less.

8. Jeffries did not tell Hoyt at that time that his actions were unwelcome. Hoyt had hugged Jeffries once before in private, and Jeffries did not consider that hug inappropriate. Jeffries testified that she did not consider either hug to have had a "sexual connotation." (Jeffries Dep. at 199). She found the second hug offensive because there was kissing and body contact in which she felt his penis against her.

9. In late October of 1991, Jeffries underwent back surgery at a hospital in Overland Park, Kansas. Hoyt visited her at the hospital. During Hoyt's visit, Jeffries asked him to rub her neck while she rested in bed and was dressed in a hospital gown.[2]

10. Following her surgery and recuperation, Jeffries resumed her participation in the CPE program and her pastoral duties in the substance abuse program on November 9, 1991.

11. Over two months after Hoyt's hug, Jeffries mentioned inappropriate hugs to Dr. Outlaw during a weekly individual supervisory conference meeting. Jeffries, however, did not mention any names. In a subsequent session, Jeffries began offering details about the incident and Dr. Outlaw surmised that the person who had hugged her was Hoyt. When he asked Jeffries if Hoyt was the person, she acknowledged it was him.

12. Dr. Outlaw asked Jeffries how she wanted to handle the situation. Dr. Outlaw

2. The plaintiff's recollection of this event at the time of her deposition differs significantly from other evidence in this case. In her "Weekly Progress Report" for the period covering her hospitalization, Jeffries wrote in relevant part:

"Glen came on Wednesday and Saturday and brought flowers from Biddle on Saturday. I asked him to rub my back and legs and arms and he did it nicely ... but never came back.

I thought maybe I scared him off but he assures me that I did not and that he'll give me another rub down any time I'm ready."

(Dk. 43, Ex. L). Diana Meitler, the secretary to Dr. Outlaw, testified to having a phone conversation with Jeffries during her hospitalization in which the plaintiff said that she had asked Hoyt to rub her back and legs and that he seemed "very uncomfortable."

recalls Jeffries saying that she wanted to confront Hoyt with her observations and that she wanted Dr. Outlaw to be present as support. Jeffries recalls that Dr. Outlaw told her that she had probably overreacted as he had received no prior complaints about Hoyt. At that time, Dr. Outlaw knew that Jeffries had filed against her supervisor at a previous CPE program in Kansas City a sexual harassment claim for inappropriate hugging.

13. The last part of December of 1991 through the last part of January of 1992, the issue of Hoyt's inappropriate hugging was a topic discussed at the interpersonal relations group meetings attended by Hoyt, Jeffries, Muncey and Outlaw.

14. The plaintiff's notes about the discussion occurring in these group meetings reveal several key events. In front of the group, Hoyt apologized to Jeffries for the hug. During a meeting, Jeffries offered a "make up hug" to Hoyt, and he refused. Jeffries' comments also reflect that she did not consider the issue resolved and that she was often dissatisfied with the way it was being handled during the group discussions.

15. After the "hug" incident became an issue for the interpersonal relations group, Dr. Outlaw told the plaintiff on more than one occasion to not go outside the group with this issue. Dr. Outlaw made these statements out of concern for the confidentiality surrounding the group dynamics and for the effect on the CPE program.

16. During an individual supervisory conference, Dr. Outlaw spoke with Hoyt about the hugging incident. Dr. Outlaw warned Hoyt not to repeat such behavior or he would be removed from the CPE program.[3] After October 4, 1991, Hoyt committed no sexually offensive, non-consensual act against Jeffries.

17. Dissatisfied with the group discussions and the actions taken by Dr. Outlaw, Jeffries delivered on January 27, 1992, a letter to Norma Stephens, the Hospital superintendent, which described the hugging

incident and her observation that Dr. Outlaw's response was inadequate.

18. Treating the letter as a formal complaint of sexual harassment, Ms. Stephens directed the Hospital's two internal Equal Employment Opportunity ("EEO") representatives to investigate.

19. On January 30, 1992, Jeffries met with Dr. Outlaw for her regular individual supervisory conference. Dr. Outlaw recorded this conference which was later transcribed. The tape recording shows that Dr. Outlaw was angry with Jeffries for taking this issue away from the interpersonal relations group and placing it before the superintendent of the hospital. Dr. Outlaw explained to Jeffries that he considered her actions to have violated the covenant relationship and trust existing between her, the group, and him. Dr. Outlaw also told her that he would no longer supervise her but that her work at the Hospital would continue through the one-year term of her contract.

20. After completing their investigation, the EEO representatives concluded that there were grounds for considering Hoyt's actions as inappropriate but that allegations of sexual harassment were unfounded. Considering that Hoyt knew that Jeffries had filed a complaint of sexual abuse against her previous employer, the EEO representatives were critical of Hoyt's judgment and recommended a written warning be placed in Hoyt's file about inappropriate behavior and the need for him to focus on boundaries. Ms. Stephens did send a letter of reprimand to Hoyt.

21. The EEO representatives also concluded that Dr. Outlaw had "failed to investigate the allegations of sexual harassment" and "did not take the necessary steps to ensure that no retaliation or intimidation against the employee who complained." (Dk. 49, App., Ex. 5). The representatives also expressed concern about some of Dr. Outlaw's recorded comments which could constitute "underlying threats of retaliation."

3. The court does not agree that the findings by the Hospital's EEO representatives necessarily

controvert Dr. Outlaw's testimony on this issue.

22. From and after the time that Jeffries first told Dr. Outlaw about the hug until her resignation, the plaintiff continued as a residency student in the Hospital's CPE program. During that same period, her duties were never changed, her salary was never stopped or reduced, and her benefits were never reduced or eliminated.

23. On April 24, 1992, the plaintiff submitted her letter of resignation stating the resignation would be effective May 31, 1992. The plaintiff testified that the reasons for her resignation were that Dr. Outlaw was intimidating her friends and that her seminary had recommended that she change her ministry settings.

## SEXUAL HARASSMENT—HOSTILE WORK ENVIRONMENT

### A. *Governing Law*

■ Of the two principal theories of sexual harassment recognized under Title VII, the plaintiff's claim rests on a theory of hostile work environment. For harassment to be actionable under Title VII, it must alter the conditions of employment. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986). To prevail under this theory, the plaintiff must prove that the sexual conduct had " 'the purpose or effect of unreasonably interfering' " with her work performance or created " 'an intimidating, hostile, or offensive working environment.' " *Martin,* 3 F.3d at 1418 (quoting *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404–05); *see also Eichenwald v. Krigel's, Inc.,* 908 F.Supp. 1531, 1539 (D.Kan. 1995).

■ "[A]n employee may prevail in an action for sexual harassment either if the asserted harassment was 'pervasive' or if there was only a single incident of harassment which, standing alone, was sufficiently severe." *(Creamer v. Laidlaw Transit, Inc.,* 86 F.3d 167, 170 (10th Cir.1996), *petition for cert. filed,* 65 U.S.L.W. 3353 (U.S. Sept. 9, 1996) No. 96–5913). "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violat-

ed." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295, 301 (1993) (quoting *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404–05). The Supreme Court said this standard is the middle ground between one that makes merely offensive conduct actionable and a standard that requires a psychological injury. *Id.* at 20, 114 S.Ct. at 370, 126 L.Ed.2d at 301. A "mere utterance of an ... epithet which engenders offensive feelings in a employee," *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405–06 does not impact a condition of employment and, therefore, does not implicate Title VII. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370, 126 L.Ed.2d at 302. On the other hand, Title VII becomes an issue before the employee suffers a nervous breakdown. *Id.*

■ To recover on her claim, the plaintiff must prove the work environment would reasonably be perceived, and was perceived by her, as hostile or abusive. *Id.* The Supreme Court put it this way:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment and there is no Title VII violation.

510 U.S. at 21, 114 S.Ct. at 370, 126 L.Ed.2d at 302. In short, a hostile work environment claim includes elements of both subjective and objective harm to the employee. *Spain v. Gallegos,* 26 F.3d 439, 447 (3rd Cir.1994).

■ When is a work environment "hostile" or "abusive" is a case-by-case determination guided by no sharply defined rules. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370, 126 L.Ed.2d at 302. "Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances." *Sauers v. Salt Lake County,* 1 F.3d 1122, 1126 (10th Cir.1993). Circumstances to consider in each case include:

the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required. *Harris,* 510 U.S. at 23, 114 S.Ct. at 370–71, 126 L.Ed.2d at 302–03. An environment that is discriminatorily abusive "often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris,* 510 U.S. at 22, 114 S.Ct. at 371, 126 L.Ed.2d at 302. These tangible effects are not a precondition to Title VII liability; it is enough to prove the harassing conduct was so severe or pervasive as to create an abusive work environment.

 The elements to a hostile-environment sexual-harassment prima facie case are: (1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) the harassment was based on the plaintiff's sex; (4) the alleged harassment was sufficient to affect a term or condition of employment; and (5) the employer either actively engaged in the harassment or is in some position on which liability can be imputed. *Eichenwald v. Krigel's, Inc.,* 908 F.Supp. at 1539; *Plakio v. Congregational Home, Inc.,* 902 F.Supp. 1383, 1389 (D.Kan. 1995) (and cases cited in each).

## B. Analysis

The defendants first contend there is no legal basis for holding them liable for the alleged sexual harassment by Hoyt. The plaintiff alleges a liability theory of employer negligence.

 Relying on agency principles, the Tenth Circuit has identified three alternative bases for imposing employer liability for sexual harassment:

> An employer is liable for: (1) any tort committed by an employee acting within the scope of his or her employment; (2) any tort committed by an employee in which the employer was negligent or reckless; or (3) any tort in which the employee purported to act or speak on behalf of the employer and there was reliance upon apparent authority, or the employee was aided in accomplishing the tort by the existence of the agency relation.

*Hirase–Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 783 (10th Cir.1995) (citations omitted). The applicable liability theories differ between co-worker harassment cases and supervisor harassment cases. *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 803 (6th Cir.1994). An employer is not liable for sexual harassment by a non-supervisory employee unless the employer was negligent. *See Hirase–Doi,* 61 F.3d at 783. In other words, an employer is not strictly liable for a co-employee's sexual harassment of another employee. *Zimmerman v. Cook County Sheriff's Dept.,* 96 F.3d 1017, 1018–19 (7th Cir.1996).

 In this context, employer negligence "is defined as 'failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known.'" *Hirschfeld v. New Mexico Corrections Dept.,* 916 F.2d 572, 577 (10th Cir.1990) (quoting *E.E.O.C. v. Hacienda Hotel,* 881 F.2d 1504, 1516 (9th Cir.1989)). Such a theory is one of direct, not derivative liability, for the employer is liable only if it knew or should have known of the hostile work environment. *Fleenor v. Hewitt Soap Co.,* 81 F.3d 48, 50 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 170, 136 L.Ed.2d 112 (U.S.1996) (No. 96–47). Common issues under this theory are whether the employer had notice of the sexual harassment and whether the employer's response upon learning of the harassment was reasonably adequate. This case presents both issues as well as the more fundamental issue whether a causal relationship exists between the employer's alleged negligence and the employee's alleged injury.

 The plaintiff devotes her brief to arguing that Dr. Outlaw did not take reasonable remedial action in response to her first

complaint in December of 1991. The plaintiff, however, offers no evidence showing that Dr. Outlaw or any other supervisory agent of the defendant knew or should have known that Hoyt presented an undue risk of sexual harassment in the workplace. An "employer's liability results if the employer 'had reason to believe that an undue risk of harm would exist because of the employment. The employer is subject to liability only for such harm as is within the risk.'" *Hirase–Doi*, 61 F.3d at 784 (quoting *Restatement (Second) of Agency* § 213, cmt d). There are no allegations that prior to October 4, 1991, there was an atmosphere charged with pervasive sexual harassment or of other employees complaining about incidents of sexual harassment. In a case as here where the harassment charged is a single incident, "the employer's duty to investigate and if appropriate take remedial measures is not activated until the employee complains of sexual harassment or information about the harassment comes to the employer's attention from some other quarter." *Zimmerman*, 96 F.3d at 1019. Therefore, the plaintiff has not come forth with sufficient evidence as to trigger a duty on the defendant to investigate, prevent, or remedy, prior to October 4, 1991.

Apart from the notice issue, the plaintiff's claim also fails for a lack of evidence establishing a causal relationship between the defendant's alleged negligence and the harm for which the plaintiff seeks recovery. In the pretrial order, the plaintiff alleges the hostile work environment was based on the following incident:

> On or about October 4, 1991, plaintiff was the victim of a physical sexual attack by Glenn Hoyt, a fellow student in the CPE program. The attack took place in plaintiff's office at the Osawatomie State Hospital. The attack by Mr. Hoyt occurred because the defendants failed to take reasonable remedial action to prevent it.

(Dk. 53 at 3). The plaintiff does not allege that Hoyt or any other employee or supervisor at the Hospital sexually harassed her after October 4, 1991. In her brief opposing summary judgment, the plaintiff concedes that she "first complained to Dr. Outlaw in early December of 1991 in regard to Mr.

Hoyt's aggressive conduct towards her." (Dk. 49 at 12–13). She then outlines the manner in which she claims Dr. Outlaw failed to investigate and remedy the situation after her complaint. Even assuming that Dr. Outlaw had handled her complaint in the non-negligent manner alleged by the plaintiff, the injury from harassment of which she complains would still have occurred. Consequently, the plaintiff is unable to prove that the defendants' wrong is the cause of her alleged injury. *See Zimmerman*, 96 F.3d at 1019.

██ Finally, were the plaintiff able to establish notice to the defendants and a causal relationship between the defendants' negligence and her claimed injury, the court would still grant summary judgment to the defendants. Her version of the hug does not establish a single incident of harassment sufficiently severe enough to alter the terms and conditions of her employment. During her progress notes, she refers to the hug as "innocent," giving the unmistakable impression that she did not believe the hug created an abusive or hostile environment. In addition, the court does not believe that a reasonable person under these circumstances would find a hostile or abusive environment as a result of Hoyt's hug and/or Dr. Outlaw's decision and course of conduct to go along with Jeffries' suggestion and process her complaint in the interpersonal relations group. The uncontroverted facts establish as a matter of law that whatever shortcomings existed in Dr. Outlaw's handling of Jeffries' complaint were promptly cured when the Hospital's administration became involved. The defendants are entitled to summary judgment on the plaintiff's hostile work environment claim.

## RETALIATION CLAIM

As alleged in the pretrial order, the plaintiff claims that upon her complaint to the Hospital's superintendent Dr. Outlaw then retaliated against her as follows:

> (1) severely reprimanding the plaintiff on January 30, 1992, for complaining to the Superintendent about sexual harassment, (2) refusing to talk to plaintiff unless she allowed him to tape record all conversa-

tions; (3) refusing to act as the plaintiff's supervisor; (4) stating to plaintiff that her peers would not work with her anymore because she broke a trust; (5) refusing to give plaintiff her CP quarterly performance evaluations as required, and (6) threatening to refuse to renew the plaintiff's annual contract as a resident chaplain and CPE student.

(Dk. 53 at 4). The defendants seek summary judgment contending the plaintiff suffered no adverse employment action. The plaintiff simply responds that Dr. Outlaw's anger and threats expressed at the meeting on January 30, 1992, constituted adverse actions.

■ To establish a prima facie case of retaliation, the plaintiff must show: (1) she engaged in protected opposition to Title VII discrimination or participation in a Title VII proceeding; (2) adverse action by the defendant employer subsequent to or contemporaneous with the plaintiff's protected activity; and (3) a causal connection between the protected activity and the employer's adverse action. *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 985 (10th Cir.1996); *Griffith v. State of Colo., Div. of Youth Services,* 17 F.3d 1323, 1331 (10th Cir.1994).

■ Courts liberally define an adverse employment action. *See Berry,* 74 F.3d at 986. " '[A]dverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well.' " *Smart v. Ball State University,* 89 F.3d 437, 441 (7th Cir. 1996) (quoting *Collins v. State of Ill.,* 830 F.2d 692, 703 (7th Cir.1987)). Although adverse job actions cover more than quantifiable losses of salary or benefits, "not everything that makes an employee unhappy is an actionable adverse action." *Smart,* 89 F.3d at 441. To be actionable, the adverse employment action must be "material:"

> "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices that might be unique to a particular situation."

*Rabinovitz v. Pena,* 89 F.3d 482, 488 (7th Cir.1996) (quoting *Crady v. Liberty Nat'l Bank & Trust,* 993 F.2d 132, 136 (7th Cir. 1993)).

Examples of adverse employment actions include decisions that have a demonstrable adverse impact on future employment opportunities or performances, *see Berry,* 74 F.3d at 986; demotions, adverse or unjustified evaluations and reports, *id.; McKenzie v. Atlantic Richfield Co.,* 906 F.Supp. 572, 575 (D.Colo.1995); transfer or reassignment of duties, *Sauers v. Salt Lake County,* 1 F.3d 1122, 1127–28 (10th Cir.1993); failure to promote, *Kenworthy v. Conoco, Inc.,* 979 F.2d 1462, 1471 (10th Cir.1992); and unfavorable letters of reference to prospective employers, *Rutherford v. American Bank of Commerce,* 565 F.2d 1162, 1164–65 (10th Cir.1977). These cases are all consistent with the general proposition that " '[a]n adverse action is one that affects the terms, privileges, duration, or conditions of employment.' " *Yerdon v. Henry,* 91 F.3d 370, 378 (2nd Cir.1996) (quoting *Johnson v. Frank,* 828 F.Supp. 1143, 1153 (S.D.N.Y.1993)).

■ An employer's words or decisions are not adverse employment actions just because the employee dislikes or disagrees with them. Examples of where an employer's words or decisions did not amount to adverse employment actions include: supervisors gave the plaintiff a performance review that was lower than previous reviews but still within the range of satisfactory, *Rabinovitz,* 89 F.3d at 489; *Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 896 (10th Cir.1994); "mere criticism and counseling alone do not constitute 'adverse action,' " *Simmerman v. Hardee's Food Systems, Inc.,* No. 94–6906, 1996 WL 131948, at *14 (E.D.Pa. Mar. 22, 1996); fellow employees treated plaintiff "almost contemptuously" and subjected her to "isolation treatment," and the plaintiff's work performance was publicly criticized; *Beaver v. Prudential Ins. Co. of America,* No. 94–4181–DES, 1996 WL 109547, at *5 (D.Kan. Feb. 1, 1996); a nonthreatening reprimand

letter was placed in the plaintiff's personnel file but later removed, *See Fowler v. Sunrise Carpet Industries, Inc.,* 911 F.Supp. 1560, 1583 (N.D.Ga.1996); employer took various actions that did not adversely impact the plaintiff's job performance or standing, *Ballou v. University of Kansas Medical Center,* No. 93–2524–GTV, 1995 WL 261981, at *6 (D.Kan. Apr. 7, 1995); the plaintiff was issued a formal warning that was eventually removed from the personnel file, *Hopkins v. Baltimore Gas & Elec. Co.,* 871 F.Supp. 822, 836 (D.Md.1994), *aff'd,* 77 F.3d 745 (4th Cir. 1996), *cert. denied,* — U.S. ——, 117 S.Ct. 70, 136 L.Ed.2d 30 (U.S.1996) (No. 95–1961); the plaintiff received an adverse evaluation and letter of reprimand that were later rescinded; *Raley v. Board of St. Mary's County Com'rs,* 752 F.Supp. 1272, 1278, 1281 (D.Md.1990); a letter of reprimand placed in the plaintiff's file is too speculative to assume it could have future repercussions, *Rivers v. Baltimore Dept. of Recreation,* No. R–87–3315, 1990 WL 112429 (D.Md. Jan. 9, 1990). These cases stand for the proposition that "there are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions ... of Title VII." *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981).

 Based on the above precedent, the court concludes that the plaintiff has not come forth with proof that she suffered any "adverse employment action" following or contemporaneous with her complaint to the Hospital superintendent. The plaintiff's alleged adverse actions are, for the most part, statements made by Dr. Outlaw during the conference with Jeffries on January 30, 1992. Dr. Outlaw's verbal reprimand of Jeffries for violating the trust and covenant relationship of the interpersonal relations group and his criticism of her professional judgment do not rise to the level of an adverse employment action. His decision to tape record this one conference does not affect a term or condition of Jeffries' employment. The record shows that Dr. Outlaw tape recorded only the one conference and did not continue his practice. As far as Dr. Outlaw's stated refusal to act as her supervisor, the plaintiff again fails to demonstrate how this mere statement constitutes an adverse employment action. The record shows that Dr. Outlaw continued to supervise Jeffries until she left in May of 1992 and even reminded the plaintiff of the need to reapply if she intended to stay a second year. (Jeffries Dep. at 606).

 Nor can one make an adverse employment action out of Dr. Outlaw's stated observation that a peer member of the interpersonal relations group had refused to remain after Jeffries' violation of the group's trust. The plaintiff's progress notes show that the group continued to meet and function after the January of 1992. The plaintiff does not submit any evidence substantiating that Dr. Outlaw failed to prepare and submit any CPE evaluations that were required of him. Finally, Dr. Outlaw's implied threat that her annual contract would not be renewed does not amount to an adverse action. There is no dispute that under the CPE program Jeffries was required to apply for a second year and that her renewal depended upon the CPE committee's approval. Jeffries submits no evidence that Dr. Outlaw could have blocked her renewal or that he ever attempted to do so. There is nothing in the record from which one could infer that Dr. Outlaw had suggested to Jeffries that her second year depended on her withdrawing or dropping her complaint. Having resigned without ever applying for a second year, the plaintiff is unable to prove circumstances rising to the level of an adverse action.

 The record shows that after her complaint to the hospital superintendent, Jeffries continued to perform the same work on the same terms and conditions. She was regularly supervised by Dr. Outlaw, and the interpersonal relations group regularly met. The changes of which the plaintiff complains is in the quality of the relationships she had established with Dr. Outlaw and her peers. An increase in office or employment tension is a predictable result of discrimination charges. *See Fortner v. State of Kansas,* 934 F.Supp. 1252, 1268 (D.Kan.1996). Strained interpersonal relations simply are not enough

injury to state an actionable retaliation claim. "Otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996). The defendants are entitled to summary judgment on the plaintiff's retaliation claim.

## CONSTRUCTIVE DISCHARGE

■■■■ Though an employee may not be formally discharged, an employee may be constructively discharged if the employer deliberately made or allowed the employee's working conditions to become so intolerable that the employee was forced to quit. *Cockrell v. Boise Cascade Corp.*, 781 F.2d 173, 177 (10th Cir.1986). To prove a prima facie case of constructive discharge, the plaintiff must demonstrate that the defendant subjected her to working conditions that a reasonable person would view as intolerable. *Reynolds v. School Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1534 (10th Cir.1995). The plaintiff must further show that a reasonable person would consider the conditions so intolerable as to feel compelled to resign or quit. *Id.; Bolden v. PRC Inc.*, 43 F.3d 545, 552 (10th Cir.1994), *cert. denied*, — U.S. ——, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995). The plaintiff's own assessment of the working conditions, standing alone, generally "is insufficient to create a factual question for the jury as to whether a constructive discharge occurred. The test for constructive discharge is an objective one." *Ulrich v. K–Mart Corp.*, 858 F.Supp. 1087, 1093 (D.Kan.1994), *aff'd*, 70 F.3d 1282 (10th Cir.1995) (Table).

■■■■ The plaintiff obviously was unhappy with the situation at the Hospital and her strained relations with those in the CPE program. "However, not every unhappy employee has an actionable claim of constructive discharge pursuant to Title VII." *Bolden*, 43 F.3d at 552. The plaintiff's stated reasons for resigning simply do not show that the working conditions had become so intolerable that a reasonable person would have felt compelled to leave. The Hospital's administration had effectively addressed Jeffries' complaint and also had required Dr. Outlaw to maintain professional relations with Jeffries. There is no evidence that Jeffries took any additional complaints of retaliation to the Hospital's administration and that any such complaints went unresolved. The plaintiff's unhappiness with the Hospital's investigation into her harassment complaint and with Dr. Outlaw's supervision of the CPE program does not state a claim for constructive discharge.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment (Dk. 42) is granted.