Michele **PENRY,** Plaintiff,

v.

**FEDERAL HOME LOAN BANK OF TOPEKA and its representatives, and Charles R. Waggoner as defendants' representative and individually, Defendants.**

**Civil Action No. 94–4196–DES.**

United States District Court,
D. Kansas.

June 10, 1997.

Cheryl D. Myers, Michael B. Myers, Myers & Myers, Topeka, KS, for Michele Penry.

D. Brad Bailey, Office of U.S. Atty., Topeka, KS, Paul F. Figley, Jeffrey L. Karlin, U.S. Dept. of Justice, Civil Division, Wash-

ington, DC, Frank W. Hunger, U.S. Dept. of Justice, Civil Division, Washington, DC, for U.S.

Wesley A. Weathers, Weathers & Riley, Topeka, KS, for Federal Home Loan Bank of Topeka and Charles R. Waggoner.

## MEMORANDUM AND ORDER

SAFFELS, Senior District Judge.

This matter is before the court on defendants' Motion for Summary Judgment (Doc. 104). Plaintiff has filed a Memorandum in Opposition to Defendants' Motion (Doc. 121). Defendants have filed a Reply (Doc. 141). This case arises out of plaintiff's claim of hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and for intentional infliction of emotional distress. For the reasons set forth below, defendants' motion is granted.

## I. FACTS

The following facts are either uncontroverted or, if controverted, construed in a light most favorable to the plaintiff as the non-moving party. Immaterial facts and factual averments not properly supported by the record are omitted.

Federal Home Loan Bank of Topeka ("FHLB") employed Michele Penry ("Penry") as a clerk in its collateral department from February 1989 to March 1994, first under the supervision of Sonia Betsworth ("Betsworth") and then, beginning in November of 1992, under the supervision of Charles Waggoner ("Waggoner"). In March 1994, FHLB transferred Penry to another department, where she is currently employed.

FHLB hired Waggoner in November of 1989 as the collateral review manager. As part of his duties, Waggoner conducted on-site inspections of collateral at the borrowing financial institutions. The collateral assistants, including Penry, Debra Gillum ("Gillum"), and Sherri Bailey ("Bailey"), and the collateral review assistant, Sally Zeigler ("Zeigler"), took turns accompanying Waggoner on these inspection trips. As the collateral review manager, Waggoner supervised only the collateral review assistant, Zeigler. He did not supervise any of the collateral assistants until he was named collateral officer in November 1992. On trips, however, Waggoner was clearly in charge and was responsible for evaluating the collateral assistants that accompanied him.

During the time Waggoner worked with Penry, first as co-worker and then as her supervisor, he engaged in conduct which Penry claims created a hostile work environment within the meaning of Title VII. Penry presents evidence of numerous instances of Waggoner's alleged misconduct. These and other relevant material facts are set forth in more detail throughout the court's discussion.

## II. SUMMARY JUDGMENT STANDARD

A court shall render summary judgment upon a showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The rule provides that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The substantive law identifies which facts are material. Id. at 248, 106 S.Ct. at 2510. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant. Id. "Only disputes over facts that might properly affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id.

The movant has the initial burden of showing the absence of a genuine issue of material fact. Shapolia v. Los Alamos Nat'l Lab., 992 F.2d 1033, 1036 (10th Cir.1993). The movant may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The movant need not negate the nonmovant's claim. Id. at 323, 106 S.Ct. at 2552–53.

Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmovant must go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (interpreting Fed.R.Civ.P. 56(e)). Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Id.* at 322, 106 S.Ct. at 2552. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. at 2552–53.

A court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986) (stating that "[t]he court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues"). The court's function is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the nonmovant for a finder of fact to return a verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11. Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Id.* at 250, 106 S.Ct. at 2511.

### III. DISCUSSION

#### A. Sexual Harassment—Hostile Work Environment

Title VII prohibits sexual harassment in the workplace. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Sexual harassment under Title VII may be shown under either of two principal theories: quid pro quo discrimination or hostile work environment. *Id.* at 65–

66, 106 S.Ct. at 2404–05. Plaintiff has made no quid pro quo claim that sexual favors were coerced in exchange for employment benefits. *See Hicks v. Gates Rubber Co.,* 833 F.2d 1406 (10th Cir.1987). Rather, she charges that discrimination based on sex created a hostile or abusive work environment.

A hostile work environment exists when a plaintiff is subjected to sexual harassment "sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.' " *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (citation omitted). Sexual harassment is behavior " 'that would not occur but for the sex of the employee'.... 'If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination.' " *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1537 (10th Cir.1995) (citations omitted).

In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Court stated:

> Conduct that is not severe or pervasive enough to create an objectively hostile environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

This court, therefore, must determine whether a reasonable jury, considering the admissible evidence as presented by plaintiff in opposition to defendants' motion for summary judgment, could find that the alleged conduct was: 1) pervasive or severe enough to objectively alter the terms, conditions or privilege of employment; and 2) whether the admissible evidence demonstrates that the conduct was gender based or stemmed from sexual animus. *Gross,* 53 F.3d at 1539 (citations omitted). This determination must be made "in light of the record as a whole' and the totality of [the] circumstances, such as the nature of the sexual advances and the context in which the alleged incidents oc-

curred.'" *Id.* at 1537 (quoting *Meritor*, 477 U.S. at 69, 106 S.Ct. at 2406).

In opposition to defendants' summary judgment motion, Ms. Penry presents evidence, in the form of deposition testimony, of numerous instances of Waggoner's conduct which she contends establishes the existence of a hostile work environment. The court will first examine each of these situations for the purpose of determining whether they were gender based or stemmed from sexual animus. The court will then determine whether Waggoner's conduct was pervasive or severe enough to alter the terms, conditions or privilege of employment.

■ Penry presents deposition testimony showing that Waggoner, after becoming her supervisor, forced her to tell him when she went on breaks, followed her to the door of the restroom, and required her to account for her time on detailed forms. Penry contends that this conduct would not have occurred but for her gender. She argues that "Waggoner's obvious fascination with woman's daily routine ... is inherently sexual in nature." Penry presents no evidence, however, other than speculation, that these activities were motivated by sexual animus or gender bias. Indeed, Penry states in her deposition that the true motivation for this conduct was retaliation for her complaints to Betsworth. As such, this conduct, though offensive, cannot be construed as being motivated by sexual animus or gender bias. Likewise, Penry's other allegations of retaliation by Waggoner, such as his remark after Bailey's resignation that there was "one down and two to go," and his April 27, 1993, meeting with Penry and Gillum to "clear the air," cannot be characterized as motivated by sexual animus or bias.

■ Penry also cites evidence showing that Waggoner played pranks on her. One prank he played six to ten times, primarily while she was pregnant. According to Penry, Waggoner would sneak up behind her, place his hands on her shoulders and loudly say her name to scare her. The other two pranks were one time occurrences. One in June 1990 where Waggoner knocked on her hotel door and then hid, and the other where he removed his hands from the steering wheel while driving an automobile in which Penry as a passenger. In her response, Penry states that she does not characterize these acts as "sexual acts per se," but argues they nevertheless constitute sexual harassment because "they illustrate Waggoner's male dominance over female employees in captive situations." The court disagrees. Penry presents no evidence, other than speculation, that these activities were motivated by sexual animus or gender bias. In her deposition, Penry states she did not know what motivated such conduct by Waggoner. Penry also fails to provide legal support for her "male dominance" theory, and the court is not persuaded to construe what appears to be gender-neutral buffoonery as a demonstration of "male dominance" over "captive" female employees. The fact that Penry may have been "isolated and alone" in her work cubicle or "captive" in Waggoner's car does not convert gender-neutral pranks into conduct motivated by sexual animus or gender bias.

■ Penry also opposes defendants' summary judgment motion with evidence of Waggoner's conduct during out-of-town work assignments. Penry complains that in March 1990, Waggoner did not help her lift heavy boxes during an on-site inspection of a bank and that she was required to eat dinner with Waggoner during out-of-town inspections. She also complains that while on an out-of-town inspection, Waggoner told her to find a ride back to her hotel from a bank employee because he would be out inspecting property. Penry offers no evidence that these episodes resulted from gender bias or animus. To the contrary, they appear to be gender neutral, as do Waggoner's comments, during a business trip, about his marital problems. Penry argues that the bank's travel and dining arrangements "provided a ready arena for Waggoner's sexual conduct." The court finds no merit to this argument. Likewise, Penry's claim that the assignment to travel with Waggoner constitutes sexual harassment is also unavailing. Without evidence to the contrary, management decisions, even if injudicious, may not be characterized as due to gender. *See Ballou v.*

*University of Kansas Medical Ctr.,* 871 F.Supp. 1384, 1390 (D.Kan.1994).

■ Penry next opposes defendants' summary judgment motion by offering evidence of Waggoner's offensive comments and outbursts. Penry complains that Waggoner often yelled at Betsworth for her errors, that he demeaned Betsworth behind her back, and said that all women in the safekeeping department were "dumb" and that his wife was "ignorant." Penry also complains about Waggoner's use of the term "gals" to refer to the women in his department. Betsworth testified that Waggoner yelled at her and she yelled at him, but she never felt he was abusive to her. While such antics may contribute to an offensive or even "hostile" environment, there is no evidence that this hostility derived from some gender-based animosity or bias. The Tenth Circuit has held that criticism of an employee's work, without some type of gender-specific reference, is not gender-based conduct. *Gross,* 53 F.3d at 1545–46. Additionally, "dumb" is a gender neutral term since it can apply equally to both sexes. *Id.* at 1543; *Young v. Finish Line, Inc.,* 1995 WL 472783 at * 5 (D.Kan.). This reasoning also applies to Waggoner's use of the term "ignorant." Significantly, Penry stated in her deposition that Waggoner's use of the term "dumb" to refer to the women in the safekeeping department was not due to sexual animus, but was an example of his general tendency of excusing his own mistakes by shifting blame to other parties. Finally, Penry presents no evidence that Waggoner's use of the term "gals" stemmed from sexual animus. According to Waggoner, he used the term out of habit, not out of sexual animus. Moreover, it appears that it was not the term itself that offended Penry, but that it was used by Waggoner. Penry stated that she was not offended when her prior female supervisor referred to Penry and other collateral department employees as "her girls."

■■ Penry also complains that in April 1993, she and Waggoner disagreed over an irregular transaction in the file of a member bank for which she was responsible. When Penry kept insisting that the irregularity was not a mistake, Waggoner, while seated at his desk, shouted to "just sit down and shut up a minute." Penry, afraid that he would "come up out of the chair," exited his office and he followed her shouting "Michele, you're insubordinate. I don't have to take this off of you." Although Waggoner's outburst may have been rude and unprofessional, Penry has made no showing that this outburst would not have occurred but for her sex. Penry presents no evidence that Waggoner physically threatened her other than her statement that she believed "he might come up out of the chair" and that he had a "glazed look in his eye like he was crazy." There is evidence, however, that Waggoner's hostility was motivated by his belief that Penry was not properly doing her job. As such, "Title VII ... does not give a woman immunity from being reprimanded in the presence of her co-workers if her supervisor believes that she has violated work rules or has been negligent in performing her job." *Gross,* 53 F.3d at 1545–46.

■ Penry next complains that on an out-of-town trip, Waggoner, while at dinner with Penry, ordered mixed drinks called "sex on the beach" and " 'cum' in a hot tub." Penry presents no evidence that Waggoner made any sexual overtures toward her or any sexual comments other than to order the drink. As such, merely ordering a drink with a vulgar name, while crude behavior in a business setting, does not demonstrate sexual animus or gender bias. Waggoner's remark in October 1990 that the man at the next table "had his hand up the woman's dress and they might as well be having sex" is similarly crude and impolite. So is his October 1991 reference to the Crossroads Mall in Nebraska as looking like "two hooters" or as the "bra bazaar" or the "boobs up" mall. Nevertheless, the court is not convinced that Waggoner would not have made these remarks but for Penry's gender. To the contrary, it seems likely, in light of Penry's testimony regarding Waggoner's conduct, that he would have made the same remark to any associate, male or female, he may have been traveling with. Again, while such conduct in a business environment might demonstrate a certain degree of baseness, it does not demonstrate sexual animus or gender

bias, and Penry presents no evidence to the contrary.

■ Finally, Penry claims. the evidence shows that: 1) In March 1990, while at dinner on an out-of-town trip, Waggoner asked her whether women have "wet dreams"; 2) in October 1990, while on an out-of-town trip, Waggoner mentioned that her bra strap was showing, "but that he kind of liked it"; 3) in March 1991, Gillum overheard Waggoner remark to a male co-worker that he could get into the drawers of another female worker, possibly Penry; 4) in the fall of 1992, before Waggoner became her supervisor, he asked her what she was wearing under her dress; and 5) Waggoner demeaned only women when he "gossiped" with Penry. The court has no doubt that of the five preceding statements a reasonable jury could find statements one and four resulted from gender bias or sexual animus. As to the other three, the court is not so sure. Nevertheless, for purposes of this summary judgment motion, all five of the numbered statements will be construed as being motivated by gender bias or sexual animus.

■ The next question is whether Waggoner's conduct was pervasive or severe enough to objectively alter the terms, conditions or privilege of Penry's employment. The Supreme Court said this standard is the middle ground between one that makes merely offensive conduct actionable and a standard that requires a psychological injury. *Harris,* 510 U.S. at 22, 114 S.Ct. at 370–71. A "mere utterance of an ... epithet which engenders offensive feelings in an employee," *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405, "does not impact a condition of employment and, therefore, does not implicate Title VII." *Harris,* 510 U.S. at 21, 114 S.Ct. at 370. On the other hand, Title VII becomes an issue before the employee suffers a nervous breakdown. *Id.* at 22, 114 S.Ct. at 370–71. Circumstances to consider in each case include: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* Only that conduct which the court has found to be discriminatory, i.e.,

resulting from gender bias or sexual animus, will be considered at this stage of the inquiry. *See Bolden v. PRC, Inc.,* 43 F.3d 545, 551 (10th Cir.1994) ("General harassment if not racial or sexual is not actionable.").

Waggoner made four gender based comments and engaged in an unspecified amount of "gossip" between spring of 1990 and fall of 1992. The court is not convinced, however, that a reasonable jury, considering all of the circumstances of this case, could find them to have created an objectively hostile work environment that altered the conditions of plaintiff's employment. None of Waggoner's conduct was physically threatening and Penry has not alleged any sexually offensive touching or unwelcome sexual advances. Considering the totality of the circumstances as presented and supported by the evidence, the incidents of misconduct resulting from sexual animus or gender bias were relatively isolated and do not constitute a "steady barrage of opprobrious" sexual comments as contemplated by the Tenth Circuit. *See Gross,* 53 F.3d at 1539. Accordingly, defendants are entitled to summary judgment on plaintiff's sexual harassment claim.

## B. Retaliation

To establish a prima facie retaliation claim under Title VII, a plaintiff must show "(1) protected opposition to Title VII discrimination or participation in a Title VII proceeding; (2) adverse action by the employer subsequent to or contemporaneous with such employee activity; and (3) a causal connection between such activity and the employer's adverse action." *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 985 (10th Cir.1996). "The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kan., Inc.,* 683 F.2d 339, 343 (10th Cir.1982). Once a plaintiff succeeds in establishing a prima facie case of retaliation, the burden shifts to the employer to proffer legitimate, nondiscriminatory reasons for the adverse action. *Berry,* 74 F.3d at 986. If the employer sets forth legitimate nondiscriminatory reasons for the adverse action, the plaintiff must then

establish that the defendant's reasons are merely a pretext for retaliation. *Id.* "The overall burden of persuasion remains on the plaintiff." *Sauers v. Salt Lake County,* 1 F.3d 1122, 1128 (10th Cir.1993).

Defendants argue that Penry fails to establish a prima facie case of retaliation because she provides no evidence of adverse action by FHLB. As the court noted in *Jeffries v. State of Kan., Dept. of Social and Rehabilitation Services,* "courts liberally define an adverse employment action." 946 F.Supp. 1556, 1567 (D.Kan.1996) (citing *Berry,* 74 F.3d at 986). " '[A]dverse job action is not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well.' " *Smart v. Ball State University,* 89 F.3d 437, 441 (7th Cir.1996) (quoting *Collins v. State of Ill.,* 830 F.2d 692, 703 (7th Cir.1987)). However, the *Jeffries* court noted, while adverse job actions cover more than measurable losses of salary or benefits, "not everything that makes an employee unhappy is an actionable adverse action." *Smart,* 89 F.3d at 441. To be actionable, the adverse employment action must be "material:"

> "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a. demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."

*Rabinovitz v. Pena,* 89 F.3d 482, 488 (7th Cir.1996) (quoting *Crady v. Liberty Nat'l Bank & Trust,* 993 F.2d 132, 136 (7th Cir. 1993)).

The *Jeffries* court set out several examples of adverse employment actions, including decisions that have a demonstrable adverse impact on future employment opportunities or performances; demotions, adverse or unjustified evaluations and reports; transfer or reassignment of duties; failure to promote; and unfavorable letters of reference to prospective employers. *Jeffries,* 946 F.Supp. at 1567 (citations omitted). These examples of adverse employment action are consistent with the general notion that " '[a]n adverse action is one that affects the terms, privileges, duration, or conditions of employment.' " *Yerdon v. Henry,* 91 F.3d 370, 378 (2nd Cir.1996) (quoting *Johnson v. Frank,* 828 F.Supp. 1143, 1153 (S.D.N.Y.1993)).

Penry alleges that she was subjected to retaliation for reporting her claims of sexual harassment by the following: 1) In January 1992, Betsworth and Cnossen required her to "say an exact sentence to stop sexual harassment"; 2) on March 1, 1993, Waggoner required her to report to him when she was going on break; and 3) on April 27, 1993, after she complained to Roger Williams about Waggoner, Waggoner called Penry and Gillum into his office and told them they should not have gone outside the department with complaints and threatened to fire them; and 4) on February 17, 1993, shortly after one of Penry's co-workers resigned, Waggoner stated to another of Penry's co-workers "well, there's one down and two to go." Noticeably lacking from these disagreeable events is any "adverse employment action," as defined above, following or contemporaneous with her complaint. The court thus finds that defendants are entitled to summary judgment on plaintiff's retaliation claim.

## C. Intentional Infliction of Emotional Distress

Defendants seek summary judgment on Penry's intentional infliction of emotional distress claim. To establish a claim of intentional infliction of emotional distress, commonly referred to as the tort of outrage, a plaintiff must demonstrate four elements: (1) the conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe. *Moore v. State Bank of Burden,* 240 Kan. 382, 729 P.2d 1205, 1211 (1986) (citing *Hoard v. Shawnee Mission Medical Center,* 233 Kan. 267, 662 P.2d 1214 (1983)). For Penry's claim to survive summary judgment, the court must,

as a matter of law, first determine that reasonable fact finders might differ as to: (1) whether defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and (2) whether plaintiff's emotional distress was so extreme and severe that the law must intervene because no reasonable person should be expected to endure it. *Id.* (citing *Roberts v. Saylor*, 230 Kan. 289, 637 P.2d 1175, 1179 (1981)). Conduct is not extreme and outrageous unless it is regarded as being "beyond the bounds of decency and utterly intolerable in a civilized society." *Id.* The threshold requirements for outrage causes of action are "necessarily high to separate meritorious claims from those based on trivialities or hyperbole." *Rupp v. Purolator Courier Corp.*, 790 F.Supp. 1069, 1073 (D.Kan.1992) (citing *Fletcher v. Wesley Medical Center*, 585 F.Supp. 1260, 1261–62 (D.Kan.1984)).

■ Intentional infliction of emotional distress "is not a favored cause of action under Kansas law." *Beam v. Concord Hospitality, Inc.*, 873 F.Supp. 491, 501 (D.Kan. 1994) (quoting *E.E.O.C. v. General Motors Corp.*, 713 F.Supp. 1394, 1396–97 (D.Kan. 1989)). "The Kansas courts have been reluctant to extend the outrage cause of action to discrimination claims, including claims of sexual harassment, arising in the employment setting." *Id.* (quoting *Laughinghouse v. Risser*, 754 F.Supp. 836, 843 (D.Kan.1990)). The existence of a hostile work environment sufficient to support a Title VII claim does not necessarily require a finding of outrageous conduct. *See, e.g., Varley v. Superior Chevrolet Automotive Co.*, 1997 WL 161942, \*16 (D.Kan.); *Anspach v. Tomkins Indus., Inc.*, 817 F.Supp. 1499, 1507 (D.Kan.1993), *aff'd*, 51 F.3d 285 (10th Cir.1995).

The few cases in which courts have permitted outrage claims to survive summary judgment motions have involved repeated physical threats and racially or sexually abusive language. *See, e.g., Laughinghouse*, 754 F.Supp. at 836; *Gomez v. Hug*, 7 Kan.App.2d 603, 645 P.2d 916 (1982). In *Laughinghouse*, the plaintiff was the victim of sexual harassment and abuse from her supervisor de-

scribed as "a concerted effort to terrorize her and to intentionally break her spirit." 754 F.Supp. at 843. Such harassment and abuse took the forms of screaming, cursing, sexual comments and unwanted touching, fits of rage which included tearing up files and throwing things, threats of termination and other tactics. *Id.* Evidence in that case indicated that the defendant mounted a concerted effort to terrorize the plaintiff and to treat her "like an animal." *Id.* Similarly, the defendant in *Gomez* subjected the plaintiff to vulgar, racist expressions and threats of violence resulting in potentially serious medical problems. 645 P.2d at 918.

■ Defendants contend that summary judgment is warranted for Penry's intentional infliction of emotional distress claim because, even viewing the facts in the light most favorable to plaintiff, the facts do not demonstrate conduct so extreme or outrageous as to permit recovery under the tort of outrage. The incidents upon which plaintiff bases her claim are those same incidents upon which she bases her Title VII claim, and which are fully discussed above. In determining whether Waggoner's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery for the tort of outrage, however, the court is not limited to considering only that conduct resulting from gender bias or sexual animus. The court may instead consider all of Waggoner's conduct which Penry alleges supports her claim.[1] Nevertheless, the court is not persuaded that a reasonable fact finder could find Waggoner's behavior so outrageous that it transcends the bounds of decency and is utterly intolerable in a civilized society. Unlike the defendant's conduct in *Laughinghouse* or *Gomez*, Waggoner's conduct did not include threats of physical violence. Nor did Waggoner's conduct include unwelcome sexual advances. Granted, the evidence presented by Penry paints a less than flattering picture of Waggoner, but his behavior was not so extreme and outrageous as to sustain a claim for intentional infliction of emotional distress.

1. The court does not agree with Penry's argument that it should consider Waggoner's misconduct toward her co-workers as support for her intentional infliction of emotional distress claim.

Likewise, FHLB's conduct in responding to Penry's complaints cannot be described as "beyond the bounds of decency and utterly intolerable in a civilized society." FHLB had a policy against sexual harassment that was set forth in its employee handbook; it had procedures in place to allow Penry to bypass Waggoner in reporting grievances; and it responded in some manner to all of Penry's complaints about Waggoner's conduct. In *Anspach*, the court described the employer's efforts to stop harassment of the plaintiff as "woefully inadequate" because the harassment in fact increased in response. 817 F.Supp. at 1507. Still, the *Anspach* court held that, as a matter of law, the employer's conduct was not so extreme as to sustain a claim for intentional infliction of emotional distress. In contrast to the employer's response in *Anspach*, FHLB's response to Penry's complaints was far more effective.

The defendants' conduct may not reasonably be regarded as so extreme and outrageous as to be considered "beyond the bounds of decency and utterly intolerable in a civilized society." Accordingly, the court grants summary judgment in favor of defendants on plaintiff's outrage claim.

**IT IS THEREFORE BY THE COURT ORDERED** that defendants' Motion for Summary Judgment (Doc. 104) is granted.