**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 17 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

LESLIE ANN JEFFRIES,

    Plaintiff-Appellant,

v.

STATE OF KANSAS,
DEPARTMENT OF SOCIAL AND
REHABILITATION SERVICES,

    Defendant-Appellee.

No. 96-3381

---

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 95-4047-SAC)

---

Alan V. Johnson of Sloan, Listrom, Eisenbarth, Sloan & Glassman, L.L.C.,
Topeka, Kansas, for Plaintiff-Appellant.

Gregory A. Lee of Gehrt & Roberts, Chartered (Linda Jane Kelly Coates and
Betsy B. Patrick, Attorneys for the State of Kansas, Department of Social and
Rehabilitation Services, with him on the brief), Topeka, Kansas, for Defendant-
Appellee.

---

Before **SEYMOUR**, Chief Judge, **ANDERSON** and **HENRY**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

Leslie Ann Jeffries filed an employment discrimination action against the State of Kansas Department of Social and Rehabilitation Services pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The district court granted defendant's motion for summary judgment on all claims. See Jeffries v. State of Kansas, Dep't of Social & Rehabilitation Servs., 946 F.Supp. 1556 (D. Kan. 1996). At issue in this appeal is Ms. Jeffries' allegation that she was subjected to hostile environment sexual harassment, that her supervisor retaliated against her for invoking the SRS sexual harassment policy, and that she was constructively discharged from her job. For the reasons set forth below, we affirm in part and reverse in part.

## I.

From August 30, 1991, until May 22, 1992, Leslie Ann Jeffries was employed as a resident chaplain and student in the Clinical Pastoral Education Program (CPE Program) at Osawatomie State Hospital (the Hospital), a facility governed by the rules and regulations of the State of Kansas Department of Social and Rehabilitation Services (SRS). The CPE Program provides specialized pastoral training to seminary students who in turn provide spiritual care to those patients who request it. Because they minister to Hospital patients and receive a salary for doing so, residents in the CPE Program are considered state employees.

Ms. Jeffries' participation in the CPE Program was governed by a one-year contract with the Department of Pastoral Care and Education running from August 30, 1991, through August 29, 1992. The contract provided for extension "by mutual consent of both parties," and for termination upon thirty-days' notice. Aplt. App. at 70. Resident students in the CPE program customarily renewed their contracts for at least a second year. Norma Stephens, a former superintendent of the Hospital who served on the CPE Program committee for many years, testified that she could not recall any student whose application for a second year had been rejected, nor could she recall any occasion on which the committee voted contrary to the renewal recommendation of the director of the CPE Program.

At all relevant times, the Reverend Dr. Ed Outlaw was the director of the CPE Program, an employee of SRS, and Ms. Jeffries' direct supervisor. As director of the program, Dr. Outlaw was the person most responsible for making decisions regarding residents' applications and continued employment. In addition to supervising and assigning the clinical duties for each student in the CPE Program, Dr. Outlaw also provided their pastoral education. According to Dr. Outlaw, the educational and employment aspects of being a resident chaplain are inseparably linked "because the only reason that a resident ever came to this program and came into an employment relationship was because of education." Id.

-3-

at 130. The resident students must be supervised by someone accredited by the Association for Clinical Pastoral Education (as Dr. Outlaw is) in order to receive educational credit for their work at the Hospital.

When Ms. Jeffries began the CPE Program, Dr. Outlaw assigned her to the Hospital's substance abuse program and asked Glen Hoyt, a fellow resident student who had just completed sixteen months as the substance abuse chaplain, to orient Ms. Jeffries to the program and her pastoral duties. On October 4, 1991, Ms. Jeffries was alone in her office on the substance abuse ward at the Hospital when Mr. Hoyt entered and began to close the door. Ms. Jeffries immediately asked Mr. Hoyt to leave the door open, but Mr. Hoyt replied that he wanted to hug Ms. Jeffries and did not wish to be seen. Mr. Hoyt then swiftly approached Ms. Jeffries, hugged her, placed his legs around her so she could not retreat, and kissed her on the neck and mouth.

Mr. Hoyt had hugged Ms. Jeffries on at least one prior occasion and she did not consider that hug to be inappropriate. Indeed, Ms. Jeffries had told members of the CPE Program that she desired platonic hugs. However, Ms. Jeffries viewed the second hug differently. As she described the incident:

> [He] invaded my space very rapidly. I felt [his] penis against my body. There was a kiss on my neck and on my mouth and it startled me, stunned me, scattered me, scared me.

Id. at 110. Although Ms. Jeffries testified that she did not consider Mr. Hoyt's

hug to have a "sexual connotation," she considered it to be "sexual behavior" which had the effect of intimidating and offending her. She testified:

> I think sometimes violence plays its way out in sexual behavior, but it isn't sexual. It appears to be violence rather than sex like rape is violence rather than sex.

Id. at 113. Ms. Jeffries testified further that she "didn't like having his penis rammed up against my body" and that she felt Mr. Hoyt intentionally caused his penis to touch her. Id. The hug and kiss by Mr. Hoyt lasted about three seconds or less, at which point Mr. Hoyt left the room. Ms. Jeffries did not inform Mr. Hoyt at that time that his actions were unwelcome. Ms. Jeffries later discovered that Mr. Hoyt had once been verbally reprimanded by the Hospital administration for making repeated unwelcome requests to a nurse that she have lunch with him.[1]

On December 12, 1991, Ms. Jeffries told Dr. Outlaw about the inappropriate hug during a weekly individual supervisory meeting without identifying Mr. Hoyt as the perpetrator. Ms. Jeffries provided further details of the hug at a subsequent supervision meeting, and when Dr. Outlaw asked her if Mr. Hoyt was the one who hugged her, Ms. Jeffries acknowledged that he was.

---

[1] Ms. Jeffries also testified in her deposition that another nurse, Terri Campbell, told her that Mr. Hoyt had made improper sexual advances toward her. However, because there is no testimony from Ms. Campbell herself, either in the form of a deposition or sworn affidavit, her statements are inadmissible hearsay and we do not consider them on summary judgment. See Treff v. Galetka, 74 F.3d 191, 195 (10th Cir. 1996) (inadmissible hearsay evidence in affidavit not considered on motion for summary judgment).

At that point, Dr. Outlaw asked Ms. Jeffries how she wished to handle the situation and she responded that she wanted to confront Mr. Hoyt about the incident in Dr. Outlaw's presence. Dr. Outlaw then told Ms. Jeffries that she was probably overreacting to the incident because he had not received any other complaints about Mr. Hoyt.[2] However, Dr. Outlaw did subsequently inform Mr. Hoyt during an individual supervisory session that his behavior was unacceptable and that he should have no further physical contact with Ms. Jeffries.[3] After Ms. Jeffries complained to Dr. Outlaw about Mr. Hoyt's inappropriate hug, Mr. Hoyt had no further physical contact with her.

The incident became a topic of discussion during several meetings of the CPE Program's interpersonal relations group (the IPR group), which consisted of Ms. Jeffries and three men -- Dr. Outlaw, Mr. Hoyt, and resident student Jerry Muncey. The IPR group is the centerpiece of the CPE Program's educational component, providing a forum for the student residents to discuss issues they confront in caring for the patients, as well as issues involving the students' relationships with one another. Dr. Outlaw testified that the key factor in a successful IPR group is the "covenant relationship," whereby the group members

_____

[2]Dr. Outlaw was apparently unaware of the earlier lunch incident involving Mr. Hoyt.

[3]Dr. Outlaw's deposition testimony reflects that he does not recall the exact date on which he issued this admonition. Aplee App. at 83.

-6-

promise to keep the group's interactions confidential.  Id. at 125.  Dr. Outlaw

acknowledged that he instructed Ms. Jeffries not to discuss the inappropriate hug

outside the group, both to maintain the covenant and because he was concerned

that allegations of sexual harassment would damage the CPE Program.[4]

Ms. Jeffries initially wanted to work through her problem with Mr. Hoyt in

the IPR setting.  At one point, for example, she wrote to Dr. Outlaw:

> We viewed the "hug" from several angles, both on Monday and again
> on Friday.  I knew I wanted to talk about it again on Friday, but I
> didn't want to infringe on Glen.  I'm always amazed when I keep my
> mouth shut for so long.  In this meeting it seemed important that
> Glen be the one to introduce the topic.

Id. at 65.  On one occasion, Mr. Hoyt apologized to Ms. Jeffries for the hug.  Ms.

Jeffries then offered a "make-up hug," which Mr. Hoyt declined.  Id. at 63.

However, Ms. Jeffries soon became frustrated that the group viewed Mr. Hoyt's

conduct as merely "inappropriate," rather than as an act of "sexual perversion,"

and at times suggested that her behavior may have led Mr. Hoyt to believe that

she welcomed the hug.  Ms. Jeffries expressed these frustrations to Dr. Outlaw in

her weekly progress reports, suggesting that the group's failure to label Mr.

---

[4]In his deposition testimony, Dr. Outlaw described the importance of the
IPR group to the CPE Program: "When the IPR group is broken, the program is
broken.  In particular in this program, because we had a limited number, you
remember I said we were required to have three persons for an accredited
program?  If any person in that group was affected adversely and chose not to
continue to participate, it wouldn't make any difference what the others thought
or felt.  The program would be affected."  Aplt. App. at 125.

Hoyt's conduct as a sexual attack was itself a form of sexual harassment:

> I think the wound to me came when you didn't believe me.  Then when Glen described the hug, you believed it was <u>innocent</u>.  You believed that I experienced distress and that the hug was <u>only</u> inappropriate.

Id. at 67.

* * *

> I do not see how giving has anything to do with sexual power plays. . . . A concern is that I am not getting a fair hearing and am not being understood. . . . I just get settled down and think I can work with that person and then we go another round and I feel put down, aside and out about it all.  Do you understand that when it comes up each time, it is as if it is happening again?  And you always rush off some place and leave me to deal with it alone.  I know why I wanted to die in the hospital.  I go through that every time a pervert gets hold of me.  Sexual violations go to the innermost part of the soul.  They wound the spirit.  I think he does not have a clue about what he did, how what he did affects the women he did it to, or how it can affect his career if I get really ticked and take action.  I have nothing to lose.

Id. at 69.

On several occasions Ms. Jeffries stated that at some point she *might* want a neutral female mediator to attend the IPR group sessions.   As she put it in January 1992:

> If we go over this again, I *may* want someone to mediate who is not personally involved and/or who is female.  I think I've asked for that before.

Id. (emphasis added).  The record does not reflect that Ms. Jeffries ever specifically requested or demanded a female mediator prior to making a formal

-8-

complaint against Mr. Hoyt. For his part, Dr. Outlaw testified that he did not believe Ms. Jeffries' expressions of dissatisfaction about the IPR group's processing of the hug compelled any further action on his part under the Hospital's sexual harassment policy.

During Ms. Jeffries' tenure as a resident student, the Hospital's policy against sexual harassment was the policy promulgated by SRS for all its employees. It stated in relevant part:

> Sexual harassment is unacceptable conduct and will not be tolerated. Any employee, supervisor or manager who engages in conduct that constitutes sexual harassment shall be disciplined in accordance with the procedures in Article 10 of the Kansas Personnel Regulations. Management personnel shall be responsible for ensuring that employees are not subjected to sexual harassment or intimidation. In carrying out this responsibility, they shall:

> -- Post this policy statement on bulletin boards, and inform employees and supervisors of the possible consequences of any conduct which constitutes sexual harassment.

> -- Investigate allegations of sexual harassment lodged against supervisors and employees.

> -- Take the necessary steps to ensure that there is no retaliation or intimidation against any employee who complains.

> -- Take appropriate disciplinary action when it is determined that sexual harassment did occur.

> Employees with allegations of sexual harassment should inform their harasser's supervisor of the problem and allow him or her a chance to take action. If the situation is resolved by the supervisor, no further action is necessary. However, if the situation is not resolved, the employee should follow the chain of command and inform higher

level administrators of the situation and allow them a chance to take action.

Id. at 102. According to Superintendent Norma Stephens, the sexual harassment policy was in all the Hospital's procedures manuals and was posted on identified bulletin boards.

On at least two occasions in January 1992, Ms. Jeffries informed Dr. Outlaw that she knew she could bring formal charges against Mr. Hoyt. In her reflection on individual supervision dated January 7, Ms. Jeffries wrote:

> As a result of our session, I understand your position better. You can listen and confront, but other than request behavior change, there isn't much else that can be done without someone mak[ing] formal charges, and then a hearing or trial can clarify the issues and provide some kind of judgements [sic]. Probably the one who brings charges would not be able to prove the charges.

Aplee. App. at 33. Likewise, in her reflection notes dated January 12, she observed: "My options are to make peace with it, bring charges, or let it consume me." Id. at 20B. Finally, on January 27, Ms. Jeffries delivered a letter to Hospital superintendent Norma Stephens describing the inappropriate hug and Dr. Outlaw's response. Ms. Stephens treated the letter as a formal complaint of sexual harassment, immediately ordered Dr. Outlaw to suspend his efforts to address the matter, and assigned two Hospital Equal Employment Opportunity (EEO) representatives to investigate the claim.

In the meantime, on January 30, Ms. Jeffries met alone with Dr. Outlaw for

-10-

her regularly scheduled individual supervisory conference. At the outset, Dr. Outlaw informed Ms. Jeffries that he would be tape recording this and all future conversations with her. It is undisputed that Dr. Outlaw was visibly angry at this time. The transcription of Dr. Outlaw's tape reveals that he suggested to Ms. Jeffries he would no longer supervise her as a student, that her contract with the Hospital was only for one year, and that he believed her to have destroyed his program and his reputation. The conversation unfolded in the following manner:

Outlaw: Now I told you yesterday that you have a job here by order of the State and you do. And you can continue here as an employee with no, there'll be no, no reprisals, no, no repercussions. You have all the rights and privileges of an employee. But I don't have to supervise you.

Jeffries: You told me I could stay three years.

Outlaw: No, I never told you you could stay three years. You've got a one-year contract.

Jeffries: You said I could stay, huh, until I finished seminary.

Outlaw: I said you had one-year contract and I said, you know, we do it one year at a time and if things work out, then we extend it. Nobody works here but one year at a time. This is a training position. Go over there and check it with Alan [Davidson] if you want to.

Jeffries: I know I have a contract until the end of August.

Outlaw: That's right.

Jeffries: But by phone you said, "If you want to stay til you finish seminary, you can."

-11-

Outlaw:     Well, I don't know how I can -- I can't respond to that right now.

                                    * * *

Outlaw:     You know, I would guess, that, I would guess that my reputation here, as far as people in Kansas City, is probably crap.

Jeffries:   Ed, I always have said you are a fair man. You try to understand. You're trying to work with me. That's what I've always said. I've always said.

Outlaw:     Why didn't you leave it there and let's keep working instead of you take it outside and beyond me so I didn't have anymore thing to do with it? It's over, Ann. I'm finished . . .

Aplt. App. at 76-77, 83.

Beginning on January 31, the Hospital's EEO representatives conducted a seven-day investigation of Ms. Jeffries' complaint against Mr. Hoyt, including interviews with all the principals in the case. The EEO representatives concluded that Mr. Hoyt had engaged in "sexual inappropriate behavior" but that the behavior did not constitute sexual harassment "due to the complainant not making the accused perpetrator aware that she was uncomfortable with the behavior." Id. at 93. They further found that Mr. Hoyt was willing to take responsibility for his actions and to take steps to avoid any future incidents. Ms. Stephens subsequently issued a formal letter of reprimand to Mr. Hoyt and placed it in his personnel file.

-12-

The EEO representatives also addressed Dr. Outlaw's handling of the incident, finding that he failed: 1) to inform the employees of the possible consequences of conduct constituting sexual harassment; 2) to investigate allegations of alleged sexual harassment; 3) to take steps necessary to ensure that there would be no retaliation or intimidation against Ms. Jeffries; and 4) to take appropriate disciplinary action when he determined that inappropriate sexual behavior did occur. In addition, they found Dr. Outlaw's response to Ms. Jeffries' formal complaint exhibited "distrust, intimidation, blaming, lack of professionalism, and some underlying threats of retaliation." Id. at 93-94. The EEO representatives further shared with Dr. Outlaw that they would have found it difficult to process a sexual harassment claim in a group of three men and one woman and suggested that a mediator would have been helpful. The record contains no evidence that the Hospital issued a formal reprimand to Dr. Outlaw or sought to monitor his subsequent behavior toward Ms. Jeffries, although the Hospital did appoint a mediator to work with the IPR group during the course of the investigation.[5]

Under orders from Ms. Stephens, Dr. Outlaw continued to "supervise" Ms.

---

[5]Although the record indicates the mediator's presence in the group was temporary, it does not reflect exactly how long the mediator worked with the group.

-13-

Jeffries in some capacity upon the completion of the EEO investigation.[6]

However, on April 24, 1992, Ms. Jeffries submitted her resignation from the CPE Program effective at the end of May.  According to her testimony, she did so for several reasons:

> One is the threat to other people's emotional health while I was there with Ed intimidating friends of mine.  Another is my school, who watched my progress closely there.  I was required to submit statements and papers because it was my ministry setting.  My school was concerned enough, they asked me to be gone from there by the end of May.  When I went I moved there because before I ever went there Ed asked if I would stay three years and I said: We need to know if we're compatible.  And he pushed me until the first of the year to find out what my schedule would be the next year so I would stay there.  And then when he told me I could not stay there past the end of August, I had to have a ministry setting.  As Ed knows, United Methodists get their ministry setting in June.  So I left.  But my school actually was the mover that got me out of there.

Id. at 117.  Although Dr. Outlaw testified that he asked Ms. Jeffries several times during the Spring of 1992 to submit her application for the following year, Ms. Jeffries disputes any claim that Dr. Outlaw encouraged her to stay and asserts the suggestions that she reapply were in fact veiled threats. Moreover, Ms. Jeffries testified that Dr. Outlaw refused to supervise her pastoral  studies (as opposed to her clinical duties) up until her departure in May 1992.  Dr. Outlaw apparently disputes this claim.

---

[6]As we will explain further infra, the question of exactly how Dr. Outlaw supervised Ms. Jeffries is a crucial issue in this litigation.

## II.

We review <u>de novo</u> the district court's disposition of a motion for summary judgment, applying the same standards used by the district court pursuant to Fed. R. Civ. P. 56(c). <u>See</u> <u>Woodman v. Runyon</u>, 132 F.3d 1330, 1337 (10th Cir. 1997). Summary judgment is appropriate if the record contains no evidence of a genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law. <u>Id.</u> We give the nonmovant "wide berth to prove a factual controversy exists." <u>Ulissey v. Shvartsman</u>, 61 F.3d 805, 808 (10th Cir. 1995). The court does not weigh the evidence, but instead determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Bingaman v. Kansas City Power & Light Co.</u>, 1 F.3d 976, 980 (10th Cir. 1993) (internal quotation marks and citation omitted). In making this determination, the court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. <u>See</u> <u>Thomas v. Int'l Bus. Machs.</u>, 48 F.3d 478, 484 (10th Cir. 1995).

## A.

Ms. Jeffries initially contends that she was subjected to hostile environment sexual harassment when Mr. Hoyt hugged, kissed, and pressed his body up against

her on October 4, 1991, and that the Hospital is liable for failing first to prevent, and then adequately to remedy, Mr. Hoyt's sexually inappropriate conduct. SRS argues that this isolated incident was not sufficiently severe or pervasive to create a hostile environment or alter the terms and conditions of Ms. Jeffries' employment. SRS further argues that upon learning Ms. Jeffries was hugged by Mr. Hoyt in a manner she did not welcome, the Hospital successfully prevented any further unwelcome conduct and therefore cannot be held liable for its response to Mr. Hoyt's actions.

On this record, we need not decide whether the single incident of Mr. Hoyt's admittedly inappropriate hug created a hostile work environment for Ms. Jeffries because we hold that SRS and the Hospital are not liable for his conduct or for failing to respond to it. This court has set forth the following grounds for holding an employer liable for an employee's actions:

> An employer is liable for: (1) any tort committed by an employee acting within the scope of his or her employment; (2) any tort committed by an employee in which the employer was negligent or reckless; or (3) any tort in which the employee purported to act or speak on behalf of the employer and there was reliance upon apparent authority, or the employee was aided in accomplishing the tort by the existence of the agency relation.

Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 783 (10th Cir. 1995); see also Hicks v. Gates Rubber Co., 833 F.2d 1406, 1417-18 (10th Cir. 1987). In this case, Ms. Jeffries seeks to hold SRS and the Hospital liable based

on a theory of negligence.

Under Title VII, an employer is negligent if it "fail[s] to remedy or prevent

a hostile or offensive work environment of which management-level employees

knew, or in the exercise of reasonable care should have known." Hirschfeld v.

New Mexico  Corrections Dep't, 916 F.2d 572, 577 (10th Cir. 1990) (internal

quotation marks and citation omitted).[7]  In order to prevail on an employer

---

[7]Management-level employees are generally defined as supervisors possessing substantial authority over the terms and conditions of employment, such as the ability to hire, discharge, or discipline employees.  See Torres v. Pisano, 116 F.3d 625, 637 (2d Cir. 1997); E.E.O.C. v. Hacienda Hotel, 881 F.2d 1504, 1516 (9th Cir. 1989).  Neither Ms. Jeffries nor the Hospital appears to dispute that Dr. Outlaw was a management-level employee for purposes of responding to complaints of sexual harassment within the CPE Program, and therefore notice to Dr. Outlaw of Mr. Hoyt's hug constitutes notice to the Hospital.  In any event, we have also imputed an employee's knowledge of sexual misconduct to an employer, regardless of whether an employee is management, where company policy specifically designates that employee as the proper person to receive and discuss complaints of sexual harassment.  See, e.g., Hirase-Doi, 61 F.3d at 784-85 (report of harassment to union vice-president constituted notice to employer where employee policy manual provided that employees could discuss problems of sexual discrimination with union vice-president); Baker v. Weyerhaeuser Co., 903 F.2d 1342, 1345 (10th Cir. 1990) (employer had notice of harassment once plaintiff reported incident to immediate supervisors who under company policy were required to pass on information to "upstairs management").  The sexual harassment policy here clearly instructs employees with allegations of sexual misconduct to inform their harasser's supervisor and give the supervisor the first chance to resolve the problem.  Thus, when Ms. Jeffries, in accordance with the Hospital policy, informed Dr. Outlaw of the inappropriate hug, this knowledge was imputed to the Hospital.  Finally, we note that the Hospital does dispute exactly *how much* authority Dr. Outlaw exercised over the CPE Program with regard to Ms. Jeffries' retaliation claim.  Those issues are discussed in Part II.B, infra, and do not bear on our analysis here.

negligence claim, the plaintiff must demonstrate that, once notified of sexual harassment, the employer failed to take "prompt, adequate and effective remedial action." Id. at 578 & n.6. Ms. Jeffries asserts SRS and the Hospital failed to execute its remedial duties in two ways.

First, she contends management-level employees failed to take adequate remedial action in response to "unacceptable conduct" by Mr. Hoyt for an earlier incident in which he was verbally reprimanded for making repeated and unwelcome requests to a nurse that she have lunch with him. Ms. Jeffries apparently argues that these untoward lunch requests should have placed the Hospital on notice that Mr. Hoyt would hug her in an inappropriate manner. Further, she seems to argue that if the Hospital had effectively disciplined Mr. Hoyt for the lunch incident he would never have hugged her in a manner she found offensive. We disagree.

An "employer's liability results if the employer . . . 'had reason to believe that an undue risk of harm would exist because of the employment. The employer is subject to liability only for such harm as is within the risk.'" Hirase-Doi, 61 F.3d at 784 (quoting RESTATEMENT (SECOND) OF AGENCY § 213, cmt. d). There is no evidence in the record that the unwelcome lunch requests should have placed the Hospital on notice of future unwelcome embraces by Mr. Hoyt. See id. (employer liability may be imputed based on knowledge of harassment "*similar in*

*nature and near in time*") (emphasis added). Neither is there evidence that the Hospital should have punished Mr. Hoyt more severely at the time given his relatively benign transgression. "[W]hat is reasonable depends on the gravity of the harassment. . . . [A]n employer is required to take more care, other things being equal, to protect its female employees from serious sexual harassment than to protect them from trivial harassment." Baskerville v. Culligan Internat'l Co., 50 F.3d 428, 432 (7th Cir. 1995).

Between the time of the lunch incident and October 4, 1991, it is undisputed that the Hospital had received no complaints about Mr. Hoyt. It is further undisputed that Ms. Jeffries did not complain to Dr. Outlaw about Mr. Hoyt's inappropriate hug until two months after the incident. Leaving aside the question of whether the hug Mr. Hoyt gave Ms. Jeffries on October 4, 1991 was "severe" sexual misconduct, it is undisputed that the Hospital had no reason to believe that Mr. Hoyt would engage in such conduct, or that Ms. Jeffries did not welcome at least a platonic hug from Mr. Hoyt, until that point in time. Absent a reason for suspicion, an employer is not required to engage in "an Orwellian program of continuous surveillance." Zimmerman v. Cook County Sheriff's Dep't, 96 F.3d 1017, 1019 (7th Cir. 1996). We therefore hold that SRS and the Hospital are not liable for failing in advance to prevent the hug.

Ms. Jeffries next argues that her supervisor, Dr. Outlaw, failed to take

-19-

reasonable remedial action when she complained to him about the hug. Specifically, Ms. Jeffries contends that Dr. Outlaw was negligent in the following ways: 1) for suggesting that Ms. Jeffries might have overreacted to the hug; 2) for encouraging her to address her complaint against Mr. Hoyt within the IPR group, a group in which she was the only woman; 3) for telling her to refrain from taking her complaint outside the IPR group; and 4) for failing to realize that her complaint triggered the Hospital's sexual harassment policy and to act according to the dictates of that policy. Although it is undisputed that Mr. Hoyt never again hugged Ms. Jeffries after the October 4, 1991, incident (even when Ms. Jeffries explicitly invited him to do so in front of several witnesses), Ms. Jeffries asserts she was harmed by Dr. Outlaw's handling of the complaint in that she felt pain, blame, and anger when she was forced to discuss the incident in the IPR group.

We do not doubt that the form of Dr. Outlaw's response to Ms. Jeffries' complaint demonstrates a lack of good judgment on his part (as the Hospital's own EEO representatives acknowledged and explained to him). It was especially unwise and irresponsible for Dr. Outlaw to discourage Ms. Jeffries from taking her complaint outside the group. However, we cannot conclude that SRS and the Hospital are liable under Title VII for failing to provide a reasonable remedy for Mr. Hoyt's conduct given that Dr. Outlaw took action reasonably calculated to prevent further hugs and the conduct never recurred after Ms. Jeffries' complaint.

See Hirschfeld, 916 F.2d at 578 (no employer liability where remedy was expeditious and effective and where no further incidents were reported following remedial action); Fuller v. City of Oakland, Cal., 47 F.3d 1522, 1528-29 (9th Cir. 1995) (obligation to provide remedy measured by affirmative action ending current harassment and deterring future harassment).

A remedy for harassing conduct should not be carried out in a way that causes harm to the victim of the harassment. See id. at 1529. Here, however, Ms. Jeffries' contention that she was "forced" to discuss the hug in the IPR group is not substantiated in the record. Indeed, it is undisputed that she raised the issue herself on several occasions and even informed Dr. Outlaw that she thought she and Mr. Hoyt would eventually work through their differences within the group setting. The record also reveals uncontroverted evidence that Ms. Jeffries was well aware she could make a formal complaint of sexual harassment at any time. Moreover, Dr. Outlaw's attempt to address Ms. Jeffries' complaint in the IPR group was within the bounds of the Hospital's sexual harassment policy, which clearly indicated supervisors could attempt to resolve complaints themselves prior to invoking the formal complaint procedure. When Ms. Jeffries did make a formal complaint, the Hospital processed it immediately and ultimately issued a

reprimand to Mr. Hoyt.[8]  It is certainly true that Ms. Jeffries was dissatisfied with the Hospital's unwillingness to agree with her assessment of Mr. Hoyt as a "pervert," but that disagreement is not actionable.  See Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 535 (7th Cir. 1993) (although employer's "remedial efforts did not meet [plaintiff's] expectations, they were both timely and reasonably likely to prevent *the conduct underlying the complaint* from recurring") (emphasis added).

We affirm the district court's grant of summary judgment to SRS on Ms. Jeffries' hostile environment sexual harassment claim.

**B.**

Ms. Jeffries next contends that Dr. Outlaw retaliated against her for filing a complaint[9] of sexual harassment against Mr. Hoyt by virtue of the following actions:  (1) angrily interrogating and reprimanding her in a tape recorded

---

[8]We note that the IPR group met for only a few weeks before Ms. Jeffries complained to Norma Stephens.  Mr. Hoyt was reprimanded by the Hospital within two months of Ms. Jeffries' initial complaint to Dr. Outlaw.

[9]SRS argues that, as a technical matter, Ms. Jeffries never filed a formal complaint against Mr. Hoyt and apparently sees some significance in this fact. We find this argument immaterial as the Hospital treated Ms. Jeffries' allegations as a formal complaint.  Further, we see no reason why a complaint to management must necessarily be "formal" in order to trigger the prohibition against retaliation. See Kilgore v. Thompson & Brock Management, Inc., 93 F.3d 752, 754 & n.1 (11th Cir. 1996) ("It is unfortunate, but not fatal, that the plaintiffs elected not to follow established written procedures for notification . . . .").

conversation following the filing of her complaint; (2) informing her that he would no longer supervise her as a student and refusing thereafter to supervise her; and (3) repeatedly informing her that her contract with the Hospital would not be renewed for a second year.[10]

According to Title VII, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); see also Sauers v. Salt Lake County, 1 F.3d 1122, 1128 (10th Cir. 1993).  In order to demonstrate retaliation:

> "[a] plaintiff must first establish a prima facie case of retaliation.  If a prima facie case is established, then the burden of production shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse action.  If evidence of a legitimate reason is produced, the plaintiff may still prevail if she demonstrates the articulated reason was a mere pretext for discrimination.  The overall burden of persuasion remains on the plaintiff."

Id. (quoting Sorensen v. City of Aurora, 984 F.2d 349, 353 (10th Cir. 1993)).  In order to make out a prima facie case, a plaintiff must prove:

(1) protected opposition to discrimination or participation in a

_____

[10]Ms. Jeffries raised other arguments below in support of her retaliation claim.  However, the three aforementioned incidents of retaliation are the only ones argued on appeal and the only ones we address here.

proceeding arising out of discrimination; (2) adverse action by the employer; and (3) a causal connection between the protected activity and the adverse action.

Id. A plaintiff may maintain an action for retaliation based on participation in a protected proceeding regardless of whether the conduct forming the basis of her underlying complaint is adjudged to violate Title VII. See Archuleta v. Colorado Dep't of Insts., Div. of Youth Servs., 936 F.2d 483, 487 (10th Cir. 1991); Wyatt v. City of Boston, 35 F.3d 13, 15 (1st Cir. 1994) ("'there is nothing in [the] wording [of the statute] requiring that the charges be valid, nor even an implied requirement that they be reasonable'") (quoting 3 Arthur Larson & Lex K. Larson, EMPLOYMENT DISCRIMINATION § 87.12(b), at 17-95 (1994)).

In granting summary judgment in favor of SRS on the issue of retaliation, the district court concluded Ms. Jeffries failed to establish the second prong of her prima facie case. The court held that the verbal upbraiding by Dr. Outlaw and the threats regarding Ms. Jeffries' status as a student and her prospects for having her contract renewed did not themselves constitute "adverse employment action." See Jeffries, 946 F.Supp. at 1568. Further, the court found that Dr. Outlaw continued to supervise Ms. Jeffries after he issued the aforementioned threats and that Ms. Jeffries had a one-year contract with the Hospital that she elected not to attempt to renew. Id. As such, the court concluded the threats had no adverse impact on the terms and conditions of Ms. Jeffries' employment. Id. In so

holding, the district court misapplied the law in this circuit construing "adverse employment action" and improperly weighed disputed facts.

Ms. Jeffries has raised a genuine factual dispute on the question of whether she suffered "adverse employment action" as a result of Dr. Outlaw's actions following her complaint to Ms. Stephens. In recognition of the remedial nature of Title VII, the law in this circuit liberally defines adverse employment action. See Berry v. Stevinson Chevrolet, 74 F.3d 980, 986 (10th Cir. 1996). While the district court recognized that adverse employment actions cover "more than quantifiable losses of salary or benefits," 946 F.Supp. at 1567, the court went on to cite a Seventh Circuit case holding an adverse employment action must be "material" in order to be actionable. See id. (citing Rabinovitz v. Pena, 89 F.3d 482, 488 (7th Cir. 1996)). The Tenth Circuit has never recognized such a "materiality" requirement and we decline to do so here. Rather, this court takes a case-by-case approach to determining whether a given employment action is "adverse." See, e.g., Corneveaux v. CUNA Mut. Ins. Group, 76 F.3d 1498, 1507 (10th Cir. 1996) (showing of adverse employment action where employee required to "go through several hoops" in order to obtain severance benefits); Berry, 74 F.3d at 986-87 (showing of adverse employment action where employer reported plaintiff of suspected crime thereby creating risk of humiliation and damage to reputation); Sauers, 1 F.3d at 1128 (showing of adverse employment action where

-25-

plaintiff was reassigned against her wishes).

In this case, Ms. Jeffries' assertion that, immediately after she complained to the Hospital administration, Dr. Outlaw told her he would not supervise her as a student, issued repeated threats that her contract would not be renewed at the end of the year, and refused to supervise her as a student for the duration of her employment, is sufficient to raise a genuine factual dispute as to whether she suffered an adverse employment action in retaliation for her complaint. Although Dr. Outlaw claims both that he continued to supervise Ms. Jeffries exactly as he had before and that he asked her several times to apply for a second year, Ms. Jeffries disputes these claims. While the district court found that "Jeffries submits no evidence that Dr. Outlaw could have blocked her renewal or that he ever attempted to do so," 946 F.Supp. at 1568, the record indicates otherwise. Ms. Jeffries offered the deposition testimony of Norma Stephens who acknowledged both that Dr. Outlaw's influence over CPE Program personnel decisions was weighty and that she did not recall the Hospital ever taking an applicant against his wishes. Dr. Outlaw himself testified he was the person most responsible for making decisions regarding the CPE Program. Dr. Outlaw's power in the hiring and contract renewal process is therefore another disputed question of fact inappropriately decided on a motion for summary judgment.

In addition, the district court asserted that "[h]aving resigned without ever

applying for a second year, the plaintiff is unable to prove circumstances rising to the level of an adverse action," thereby suggesting that a threat must be carried out in order to be "adverse." Id. We note that this case is markedly distinguishable from others in which we held that unrealized threats or tense personal relationships do not rise to the level of actionable retaliation. See Cole v. Ruidoso Mun. Sch., 43 F.3d 1373, 1381 (10th Cir. 1994) (no showing of adverse employment action where no evidence that threat to evaluate teacher more often than peers was carried out); Fortner v. State of Kansas, 934 F.Supp. 1252, 1268 (D. Kan. 1996), aff'd 122 F.3d 40 (10th Cir. 1997) (no showing of adverse employment action where supervisors' manner toward plaintiff was attributable to "increase of predictable tension in office after a discrimination charge is filed") (internal quotation marks and citation omitted). In this case, the threat of non-renewal came from a person who indisputably had considerable influence over employment and work assignment decisions in the CPE Program. In addition, educational supervision in the CPE Program is unusually dependent upon personal interactions between supervisor and student. In such a situation, an educational atmosphere permeated by threats and distrust could certainly have a significant impact on the student's education and future opportunities. We need not decide whether threats can constitute "adverse employment action" in and of themselves in order to determine that Ms. Jeffries' retaliation claim survives summary

judgment.[11]  For if Ms. Jeffries' claim that Dr. Outlaw did not supervise her as a student is true (and we must assume here that it is),[12] she was obviously deprived of the educational benefit she contracted to receive with all of the attendant consequences.  For these reasons, Ms. Jeffries claim of unlawful retaliation must be submitted to a trier of fact.

---

[11]The Supreme Court has granted a writ of certiorari on the question of whether a Title VII plaintiff can establish a claim of *quid pro quo* sexual harassment based solely on an unfulfilled threat.  See Jansen v. Packaging Corp. of America, 123 F.3d 490, 499-500 (7th Cir. 1997), cert. granted sub nom. Burlington Indus., Inc. v. Ellerth, 118 S. Ct. 876 (Jan. 23, 1998).  The Court's decision could well affect any subsequent analysis of whether unfulfilled threats may constitute "adverse employment actions" for purposes of establishing a Title VII retaliation claim.  However, we need not refrain from issuing our decision in this case given the fact discussed infra that Ms. Jeffries contends she was actually deprived of educational supervision and effectively forced out of the CPE Program in retaliation for her complaint.

[12]We note that the question of whether Dr. Outlaw supervised Ms. Jeffries *as a student* after January 30, 1992, is hotly contested, yet not well developed by either party.  It is clear and uncontested that Dr. Outlaw vehemently threatened not to supervise Ms. Jeffries as a student.  Further, although he claims to have asked her several times to reapply for another year, his evidence for this consists of his own testimony and inadmissible unsigned handwritten notes.  For her part, Ms. Jeffries testified in her deposition, without specifically differentiating between clinical and educational supervision, that Dr. Outlaw did continue to supervise her after January 30, 1992, under orders from Norma Stephens.  Yet Ms. Jeffries also testified that Dr. Outlaw did not continue to supervise her as a student and asserted he would not do so in the future.  In spite of the somewhat unclear meaning of "supervise" in portions of Ms. Jeffries' testimony, given the vehemence of Dr. Outlaw's threats in the tape-recorded conversation it is inappropriate for purposes of summary judgment to conclude that Dr. Outlaw supervised Ms. Jeffries as a student after January 1992.

## C.

Ms. Jeffries' final claim is that she was constructively discharged from her job at the Hospital due to Dr. Outlaw's actions, namely his refusal to supervise her as a student and his insistence that her contract would not be renewed for a second year, after she complained to the Hospital administration about Mr. Hoyt's conduct. In the typical Title VII constructive discharge case, the plaintiff asserts she was forced from her job due to the alleged sex discrimination. However, we have found constructive discharge based on retributive acts that follow a complaint of sex discrimination. See Woodward v. City of Worland, 977 F.2d 1392, 1402 (10th Cir. 1992).

In order to make out a constructive discharge claim, Ms. Jeffries must allege facts sufficient to demonstrate under an objective test that a reasonable person would have viewed her working conditions as intolerable. See Derr v. Gulf Oil Corp., 796 F.2d 340, 343-44 (10th Cir. 1986). The plaintiff's subjective view of the employment environment and the employer's subjective intent with regard to discharging her are both irrelevant. See id. If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged. See Yearous v. Niobrara County Mem'l Hosp., 128 F.3d 1351, 1356 (10th Cir. 1997). "Essentially, a plaintiff must show that she had 'no other choice but to quit.'" Id. (quoting

<u>Woodward</u>, 977 F.2d at 1401).

In granting summary judgment in favor of the Hospital on Ms. Jeffries'
constructive discharge claim, the district court characterized her resignation as a
reaction to her unhappiness with the manner in which the Hospital handled her
complaint and "strained relations with those in the CPE Program." <u>Jeffries</u>, 946
F.Supp. at 1569. According to the district court:

> The plaintiff's stated reasons for resigning simply do not show that
> the working conditions had become so intolerable that a reasonable
> person would have felt compelled to leave. The Hospital's
> administration had effectively addressed Jeffries' complaint and also
> had required Dr. Outlaw to maintain professional relations with
> Jeffries.

<u>Id.</u> Our reading of the record convinces us that the district court
mischaracterized Ms. Jeffries' constructive discharge claim and once again
inappropriately weighed the evidence before it.

Although SRS makes much of the fact that Ms. Jeffries enjoyed her stay in
the CPE Program and could not therefore have found conditions "intolerable,"
Ms. Jeffries does not base her claim solely on the fact that Dr. Outlaw's
statements to her following her complaint caused her discomfort or that her work
environment became unpleasant. Rather, Ms. Jeffries argues that after she
complained to Norma Stephens, Dr. Outlaw informed her that he would no longer
supervise her as a student and that her contract with the Hospital would not be
renewed. Ms. Jeffries asserts that Dr. Outlaw did not supervise her as a student

-30-

after January 30, 1992, and that he made it clear to her he would not so supervise her in the future. Far from encouraging her to reapply, Ms. Jeffries testified that Dr. Outlaw repeatedly reminded her in a threatening manner that her contract was for only one year. Moreover, Ms. Jeffries presented evidence that the primary reason she enrolled in the CPE Program was to obtain educational credit and that she needed a ministry setting in order to continue pursuing her seminary degree. It is undisputed that United Methodist seminary students like Ms. Jeffries were assigned ministry settings in June. According to Ms. Jeffries, she tendered her resignation effective in May 1992 in order to be available for a new ministry assignment given that she had been told she would not be given educational supervision in the CPE Program after August 1992 (and was not in fact receiving such supervision prior to that time). In view of these facts, a jury could conclude that a reasonable person in Ms. Jeffries' position would have felt compelled to resign from the CPE Program, not because she did not enjoy the job itself, but because she could no longer obtain an educational benefit from it. See Woodward, 977 F.2d at 1402 (finding fact question as to constructive discharge where plaintiffs testified to retributive conduct including exclusion from office conversations, exclusion from meetings, and being laughed at by coworkers).

It may be the case that Ms. Jeffries could have reapplied and had a decision on her application prior to her May resignation, or that she could have remained

-31-

in the CPE Program while being supervised by someone other than Dr. Outlaw. Yet there are no such indications in the record before this court. For these reasons, we hold that Ms. Jeffries has raised triable issues of fact on her constructive discharge claim. See id. (doubts as to severity of retributive acts and availability of other avenues to correct the conduct other than resignation should be resolved by factfinder); Carlson v. Midway R-1 Sch. Dist., 53 F.3d 878 (8th Cir. 1995) (factfinder could have concluded further notification and complaint would have been futile given other retaliatory actions by employer).

## III.

We **AFFIRM** the district court's grant of summary judgment to SRS on the issue of hostile environment sexual harassment. Because Ms. Jeffries has raised genuine fact disputes on the remaining issues, we **REVERSE** the district court's grant of summary judgment to SRS on Ms. Jeffries' retaliation and constructive discharge claims and **REMAND** for further proceedings consistent with this decision.