F I L E D

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

KENNETH R. CARVER,

      Plaintiff - Appellant,

      v.

UNITED STATES DEPARTMENT
OF THE INTERIOR, Bruce Babbitt,
Secretary; NATIONAL PARK
SERVICE,

      Defendants - Appellees.

No. 98-8070
(D. Ct. No. 97-CV-244-B)
(D. Wyo.)

**ORDER AND JUDGMENT**  *

Before **TACHA** , **BARRETT** , and **BRORBY** , Circuit Judges.

      Plaintiff Carver filed this Title VII action against defendant alleging

retaliation and constructive discharge. The district court granted summary

judgment in favor of defendant, and plaintiff appeals. We affirm.

**I. Background**

      Carver began his employment with the Department of the Interior in 1975

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

as a seasonal heavy duty truck driver at Grand Teton National Park.  In 1979, he accepted a position at Yellowstone National Park as a road and trails foreman overseeing the Beartooth highway.  In the 1980s, plaintiff unsuccessfully sought promotions to the positions of park superintendent or assistant superintendent outside of Yellowstone.  In 1989, he began filing internal equal employment opportunity ("EEO") complaints relating to the denial of promotion opportunities.  Between 1989 and 1994, Carver filed fourteen discrimination complaints against the National Park Service ("NPS").  None of these complaints involved Yellowstone or its supervisors.  On May 10, 1994, plaintiff entered into a Negotiated Settlement Agreement with NPS resolving all outstanding EEO complaints.  He agreed never to apply for a superintendent or assistant superintendent position.  In exchange, NPS significantly increased Carver's pay level and provided him with a cash settlement.

For many years prior to 1994, William Foster was Carver's immediate supervisor at Yellowstone.  Shortly after the settlement, Foster retired.  While under Foster, Carver received performance evaluation ratings at level four, "exceeding expectation," or level five, "outstanding."  He received level five ratings in the two years prior to his 1994 Negotiated Settlement Agreement.  Foster averred that he ranked Carver as outstanding because he "had a difficult job to do . . . in a difficult area and it was my feeling that he did a good job at it

2

without – he didn't get anybody killed, he didn't tear up any major pieces of equipment." Appellant's App. at 205.

After Foster's retirement in 1994, Jack Roberts temporarily acted as immediate supervisor to Carver and the other first line supervisors in the area. On November 22, 1994, over six months after the Negotiated Settlement Agreement, Roberts gave Carver a performance evaluation rating of three, "fully successful." Defendant contends that Roberts prepared evaluations of two other foreman as well, also giving them level three ratings. Defendant further maintains that the standards used by Roberts in all three of these appraisals were slightly different than those previously used by Foster. Plaintiff, however, asserts that only he received a performance evaluation and that no evidence exists to show that Roberts altered the performance standards for any of his other subordinates.

When Roberts gave the performance appraisal to plaintiff on January 31, 1995, Carver objected to it. Plaintiff contends that when he continued to press for the reason he received a lower, albeit fully satisfactory, rating and asked what he could do to improve, Roberts told him he would have to "walk on top of water." Plaintiff immediately filed an EEO complaint, alleging that this ranking constituted retaliation for entering into the Negotiated Settlement Agreement.

After plaintiff complained of his ranking, Roberts reevaluated Carver,

using the same standards as those employed by Foster. This raised Carver's rating to level four, "exceeds fully successful." Carver refused to acknowledge receipt of the revised evaluation, which he claims Roberts threw at him. Plaintiff also alleges that throughout this evaluation process, Roberts did not follow procedure and singled him out. Carver filed another retaliation claim on May 30, 1995, relating to Roberts' conduct of throwing the document at him.

In June 1995, Chris Miller permanently replaced Foster, becoming Carver's first-line supervisor. Miller prepared a performance evaluation of Carver for the 1995 work year, rating him at level three, fully successful. Carver came within .051 points of reaching level four. Plaintiff claims that Miller solicited negative information about him and received a letter that he used against him in his evaluation. Plaintiff refused to sign the appraisal and requested permission to write a rebuttal. He contends that Miller refused to give him a copy of the evaluation unless he signed it. Plaintiff also claims that Miller did not follow procedure in conducting his evaluation. On January 23, 1996, plaintiff filed another EEO complaint regarding the 1995 performance appraisal and Miller's conduct relating to it.

In February 1996, Miller instructed Carver to clean, or hire professionals to prepare, the Beartooth road camp quarters and to plan to live there in the spring. Yellowstone provided Carver with a trailer at the road camp for his summer

residence, and he had previously lived in that trailer for a number of summer seasons. However, in 1994, Carver complained of the presence of mice, and therefore possible hantavirus, in the trailer. He declined to reside in the trailer during the 1995 season, commuting to work instead. Defendant took no action at that time, other than noting Carver's refusal to live in the trailer on his evaluation. Plaintiff again refused to live in the trailer for the 1996 season.

Carver further complains that Roberts failed to automatically rehire T.D. Carter, a seasonal employee, for the 1996 season. Carter had worked under plaintiff for several seasons, but he had undergone heart surgery and missed fifty-eight of the ninety-six workdays during the 1995 season. Roberts informed Carter that he could apply for the position and compete with other candidates. He applied for and was offered the position, but he declined it. Carver filed an EEO complaint alleging that Yellowstone's failure to automatically rehire a seasoned employee during the time he needed to prepare the roads to open constituted a retaliatory, adverse employment action.

On May 28, 1996, Carver tendered his resignation to Superintendent Finley, to take effect in July. On June 12, 1996, Carver filed his fifth EEO complaint since the Negotiated Settlement Agreement. He claimed that defendant constructively discharged him as a result of the acts outlined above, contending they formed a pattern of retaliation. Plaintiff left his job on July 3, 1996.

5

## II. Discussion

We review the grant of summary judgment de novo, applying the same legal standard used by the district court. See, e.g. , Kaul v. Stephan , 83 F.3d 1208, 1212 (10th Cir. 1996). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id. (internal quotation marks and citation omitted). We view the factual record and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. See id. In deciding the appropriateness of summary judgment, "[w]e are not limited to the grounds upon which the trial court relied but may base summary judgment on any proper grounds found in the record to permit conclusions of law." Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 882 (10th Cir. 1997) (internal quotation marks and citation omitted)).

As an initial matter, it is important to note that only the final two EEO complaints discussed above form the basis of this litigation. Plaintiff acknowledged to the district court in his response to defendant's motion for summary judgment that only his complaints regarding Yellowstone's failure to automatically rehire T.D. Carter and alleging constructive discharge are at issue

6

in this case. [1] Thus, we will not address the first three EEO complaints involving his performance evaluations as independent causes of action. Nevertheless, the facts underlying these complaints may provide relevant background information that sheds light on the disputed actions properly before us. See Noland v. McAdoo, 39 F.3d 269, 271-72 (10th Cir. 1994). We may also consider the earlier incidents, to the extent they are relevant, in analyzing the series of actions that allegedly led to the constructive discharge. See Draper v. Coeur Rochester, Inc., 147 F.3d 1104, 1110 (9th Cir. 1998).

**A. Retaliation Claim Regarding Defendant's Refusal to Automatically Rehire T.D. Carter**

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) he suffered an adverse employment action subsequent to such opposition or participation; and (3) there is a causal connection between his protected activity and the adverse employment action. See, e.g., Jeffries v. Kansas, 147 F.3d 1220, 1231 (10th Cir. 1998); Cole v. Ruidoso Mun. Sch., 43 F.3d 1373, 1381 (10th Cir. 1994). Here, plaintiff did engage in protected Title VII activity, but our analysis stops there because

---

[1]The statute of limitations had run on the first three EEO complaints because plaintiff failed to file a civil action within the pertinent time frame. See 29 C.F.R. § 1614.408 (1998).

defendant's failure to automatically rehire T.D. Carter does not constitute adverse employment action.

"The Tenth Circuit liberally defines the phrase 'adverse employment action.'" Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998); see also Jeffries, 147 F.3d at 1232.  However, "we will not consider 'a mere inconvenience or an alteration of job responsibilities' to be an adverse employment action."  Sanchez, 164 F.3d at 531 (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)); see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 2268 (1998) (noting that employment action is adverse if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").  Here, defendant's decision not to automatically renew Carter's seasonal employment constitutes at most a mere inconvenience to plaintiff. Carter applied for the job with other applicants, and defendant offered him the position, which he declined.  Thus, even viewing the evidence in the light most favorable to plaintiff, no reasonable jury could find this constitutes an adverse employment action against plaintiff.

### B.  Constructive Discharge Claim

To prevail on a constructive discharge claim, plaintiff must "allege facts

sufficient to demonstrate under an objective test that a reasonable person would have viewed her working conditions as intolerable." Jeffries , 147 F.3d at 1233. "Essentially, a plaintiff must show that she had no other choice but to quit." Sanchez , 164 F.3d at 534 (quoting Yearous v. Niobrara County Mem'l Hosp. , 128 F.3d 1351, 1356 (10th Cir. 1997)) (internal quotation marks omitted); accord Jeffries , 147 F.3d at 1233. The employment conditions must be objectively intolerable. See Sanchez , 164 F.3d at 534; Jeffries , 147 F.3d at 1233. Neither the plaintiff's subjective view of the employment environment nor the employer's subjective intent is relevant. See Jeffries , 147 F.3d at 1233.

Taking the events described above in the light most favorable to plaintiff, we can discern no actions that alone or collectively would compel a reasonable person to believe he had no choice but to resign. The evaluation procedures of which plaintiff complains never resulted in a score below fully satisfactory. Furthermore, no adverse employment consequences flowed from these lower evaluation scores. The request to clean or procure the services of a pest control business to prepare the road camp trailer and live in it also would not compel a reasonable person to believe he had no choice but to resign. Plaintiff had refused to live in the trailer the previous summer, and defendant took little or no action. At most, his supervisor may have lowered his evaluation score slightly. Moreover, considering that plaintiff had previously resided in the trailer and was

9

offered the opportunity to ensure that it received proper cleaning, it is difficult to understand how the request to again reside there constituted adverse action at all – let alone that which could support or help support a constructive discharge claim. In fact, he did not live in the trailer during the summer of 1996. Finally, defendant's refusal to automatically rehire Carter cannot reasonably support a constructive discharge claim. Defendant offered Carter the job, so its action had no adverse impact on plaintiff. In sum, defendant's actions may have made plaintiff unhappy, but "not every unhappy employee has an actionable claim of constructive discharge pursuant to Title VII." Bolden v. PRC Inc., 43 F.3d 545, 552 (10th Cir. 1994). Therefore, we hold that the district court properly granted summary judgment in favor of defendant on Carver's constructive discharge claim.

## III. Conclusion

For the reasons discussed above, we AFFIRM the district court's grant of summary judgment for defendant.

ENTERED FOR THE COURT,

Deanell Reece Tacha
Circuit Judge

10